## DELAWARE TRUST CO. v. HANDY, Internal Revenue Collector.

### No. 14.

District Court, D. Delaware.

Oct. 28, 1931.

See, also (D. C.) 51 F.(2d) 867.

James H. Hughes, Jr. (of Ward & Gray), of Wilmington, Del., and Frank S. Bright, of Washington, D. C., for plaintiff.

Leonard E. Wales, U. S. Atty., of Wilmington, Del., and William T. Sabine, Jr., of Washington, D. C., for defendant.

NIELDS, District Judge.

This is an action at law brought by Delaware Trust Company, executor under the last will and testament of William Du Pont, deceased, to recover from Wallace S. Handy, collector of internal revenue for the district of Delaware, the sum of $283,130.20, with interest. This payment was made to the defendant as part of a deficiency tax assessed on the estate of the decedent aggregating $1,297,881.94, with interest thereon. William Du Pont, Jr., and Marion Du Pont Somerville, son and daughter of the decedent, were added as parties plaintiff. By stipulation filed, the case was tried by the court without the intervention of a jury. (References herein to "plaintiff" will be understood to refer to plaintiff executor.)

### Findings of Fact.

(1) William Du Pont, a citizen and resident of Delaware, with a winter residence at Altamaha, Ga., died at the latter place January 20, 1928, aged seventy-two years, four months, and twenty-nine days.

(2) Plaintiff, Delaware Trust Company, is the duly appointed, qualified, and acting executor of decedent's estate.

(3) Defendant, Wallace S. Handy, at the time of the collection of the estate tax involved in this proceeding, was and still is collector of internal revenue of the United States for the district of Delaware.

(4) Decedent created four trusts in agreements between himself as settlor and Delaware Trust Company, as trustee; the first trust was created on May 25, 1926, for the benefit of his son William Du Pont, Jr.; the second, on May 25, 1926, for the benefit of his daughter Marion Du Pont Somerville; the third, on July 12, 1927, for the benefit of

his daughter-in-law, Jean Liseter Du Pont; and the fourth, on September 1, 1927, for the benefit of his stepson, George Zinn. Each of these trusts was by its terms irrevocable and effective as of its date.

(5) At the time of the creation of the first of these trusts, decedent was over seventy years of age.

(6) Subparagraph (f) of item 6 of decedent's will reads as follows:

"To the person who may at my decease occupy the position of Vicar of the Episcopal Church located on Seventh Street near Church Street, in the City of Wilmington aforesaid, known as 'Holy Trinity (Old Swedes) Church', during his occupancy of said position and to each successor in said position during his occupancy thereof, the sum of Three Thousand Dollars ($3,000.00) per annum, said annuity to be in addition to the present salary of such Vicar and to cease at such time as the last survivor of the above five annuitants mentioned in this Item of my will shall die.

"It is my intention that this annuity shall be in addition to the present salary of the position of Vicar of said Church and if said salary should be reduced or discontinued after my decease, then payment of this annuity is to be suspended during any such period of reduction or discontinuance, otherwise to be paid as hereinabove provided."

(7) Delaware Trust Company, as executor, duly filed an estate tax return, in accordance with the requirements of the Act of Congress of February 26, 1926, known as the Revenue Act of 1926, in which the property covered by the above-mentioned four trusts was not included as part of decedent's gross estate, and in which a deduction was taken for the value of the bequest to the vicar of Holy Trinity (Old Swedes) Church, as a charitable bequest.

(8) Counsel agree that on or about July 10, 1930, the Commissioner of Internal Revenue, after audit and review, finally determined the value of the securities transferred under these four trusts at the time of decedent's death (less $5,000 deducted from the value of the securities in each of the trusts) to be as follows:

William Du Pont, Jr. ........$2,025,000.00
Marion Du Pont Somerville ... 3,313,518.46
Jean Liseter Du Pont ........ 583,529.33
George Zinn ................ 511,319.78
 _____
Aggregating the sum of ...... 6,433,367.57

(9) Counsel agree that the Commissioner of Internal Revenue determined the value of decedent's gross estate as of the date of his death to be the sum of $43,125,151.33; the allowable deductions therefrom to be the sum of $1,206,603.55; and the net estate for tax the sum of $41,918,547.78.

(10) On July 19, 1930, under the provisions of section 606 of the Revenue Act of 1928 (26 USCA § 2606), a closing agreement was entered into between the plaintiff and the Commissioner of Internal Revenue, as follows:

"Whereas, it has been determined that the estate tax imposed by the Revenue Act of 1926 upon the transfer of the net estate of the decedent is seven million, seven hundred twenty-three thousand, two hundred nine and 56/100 dollars ($7,723,209.56) said tax to be subject to a credit of not to exceed 80 per centum for State inheritance taxes paid, provided satisfactory evidence of payment is furnished within three years from Jan. 21, 1929, the date the return, Form 706, was filed by the estate; and

"Whereas, said taxpayer hereby agrees to this determination, except as to so much of the said estate tax as results from the inclusion in the gross estate of transfers of property made by the decedent within two years prior to his death but after the effective date of the Revenue Act of 1926, and from the disallowance as a deduction under 'Charitable, Public and Similar Gifts and Bequests' of the item 'Annuity to the Vicar of Holy Trinity (Old Swedes) Church, Wilmington, Del., $56,042.10'.

"Now, this Agreement Witnesseth, that said taxpayer and said Commissioner of Internal Revenue hereby mutually agree that the said tax of seven million, seven hundred twenty-three thousand, two hundred nine and 56/100 dollars ($7,723,209.56), subject, as provided in the first 'Whereas' clause hereof, to a credit of not to exceed 80 per centum for State inheritance taxes paid, so determined shall be, subject to the exceptions contained in the second 'Whereas' clause hereof, final and conclusive if and when this agreement is approved by the Secretary of the Treasury or the Undersecretary."

The above agreement was approved July 19, 1930.

(11) July 30, 1930, defendant demanded payment of additional sums on account of estate taxes assessed. August 6, 1930, plaintiff paid $448,708.28 to defendant in response

to this demand. This amount included the sum of $283,130.20 sued for in this action.

(12) August 13, 1930, plaintiff filed a claim for refund of the above-mentioned sum of $283,130.20. This claim was rejected by the Commissioner of Internal Revenue by letter of November 18, 1930. This action was brought December 6, 1930.

(13) As far back as 1917, the decedent was giving his son a monthly allowance. The amount of this monthly allowance increased from time to time as his son's needs increased, ranging from $200 a month in 1917, to $1,500 a month in 1926, the date of the trust in his favor.

(14) As far back as 1916, the decedent was giving to his daughter a monthly allowance. The amount of this monthly allowance increased from time to time from $150 a month in 1916, to $1,000 a month at the time of her marriage on December 28, 1925, and continued at $1,000 a month until 1926, the date of the trust in her favor.

(15) Decedent discontinued monthly allowances to his son and daughter after the creation of the trusts in their behalf.

(16) Payments from the four trusts have been regularly and continuously made to the beneficiaries, and the corpus of each trust is still held by the plaintiff.

(17) In or about November, 1925, the decedent overlooked drawing checks for the allowances to his son and daughter. This was called to his attention by his son. The fact that decedent had forgotten to draw the monthly checks for his children appeared to annoy him greatly. As to this circumstance, William Du Pont, Jr., testified: " * * * He called Mr. Edinger, who was his secretary, to get his check book, and remarked that he wished to create a fund of some character at the bank, and let them issue the checks monthly, so that we would have them on time without being inconvenienced, and at the same time if he happened to be away from home, or on a trip at any place, that we would not have to go without our usual monthly checks, which might possibly embarrass us." Later, in a conversation with his son, decedent stated that it was time he and his sister took care of all their "desired necessities." He also referred to the fact that his daughter was about to be married and would be living away from home, so that he would not be in a position to take care of her needs, as they arose. He desired her to be independent. At the time of these statements to his son, decedent was in good health, and was carrying on his ordinary and usual activities. He did not mention death in connection with the trusts, nor the saving of estate taxes.

(18) In the early part of 1926, while in Georgia, decedent told his daughter that he was going to create trusts for her and her brother so they would have money to buy the things they wanted without coming to him. At the time of this conversation, the decedent was well and attending to his business in his usual manner. He made no mention of death nor the saving of taxes through the creation of the contemplated trusts.

(19) One Sunday in 1927, the decedent visited at his son's home in Newtown Square, Pa., and was shown about the place by his grandchildren. The next day at his office decedent spoke to his son about his mother's death (which had occurred earlier that year), and her habit of buying Christmas, birthday, and other presents for the grandchildren. He referred to the two trusts created for his son and daughter and to the fact that they "seemed to work pretty satisfactorily." Decedent told his son that he would create a trust for his daughter-in-law, the income to be used by her to purchase presents and other things for the grandchildren and for herself. He advised his daughter-in-law of the trust, and personally handed to her the first income check. At this time, decedent was in good health and very active. He made no mention of death or the saving of taxes of any kind.

(20) Decedent's wife died in January, 1927. George Zinn, her son, threatened to attack the validity of her will, in order to inherit her estate divested of any trust. Zinn made various demands upon decedent, and procured the preparation of papers in suits to be filed against him. The papers in the threatened litigation were submitted to decedent's attorney, who persuaded Zinn not to file them. Settlement of this threatened litigation was effected through the creation of a trust. By this trust, decedent "bought his peace" with Zinn. This brought to an end the threatened litigation, and provided Zinn with an income for life.

(21) In July or August, 1927, the decedent stated to his attorney that he had created trusts for his son and daughter for the purpose of providing for their financial independence; that he expected in the next ten or twelve years to increase the trust funds so that their net value would be $5,000,000 each; that in the interim he proposed to give his son and daughter money from time to time, so that he might advise them in the

handling of their money, and see how they managed the investment of it; that if they were successful in handling money he expected to give them more, but if they did not show an aptitude for investing funds, he intended to put more securities in the trusts. Decedent also told his attorney of the creation of the trust for his daughter-in-law, Jean Liseter Du Pont, to place her on the same general footing of financial independence with his two children. He also stated that the securities placed in these trusts constituted a small proportion of his estate, and that he hoped to have his estate in ten or twelve years nearly as large, if not larger, than it was before the trusts were created.

(22) Decedent retired from active business in or about the year 1900. He lived abroad for several years. Upon returning to this country, he spent the greater part of his time for a number of years at Montpelier, Va. However, in 1919, he was engaged in active business in Wilmington, Del., and became progressively more engrossed in business matters up until the time of his death.

(23) In 1926, decedent was actively interested in a number of large enterprises. He was the chief stockholder in Delaware Trust Company, a large banking institution in the city of Wilmington, and took an important part in the conduct of its affairs. He went to the bank daily, and customarily would spend an hour or two conferring with the officers of the bank about its affairs. He was president or chairman of the board of the bank, and exercised absolute control over its activities. He also directed the affairs of Delaware Title Insurance Company, which owned the large office building in which the business of the bank was carried on. April 4, 1927, he became the owner of the entire outstanding capital stock of this title company. In the years 1925 and 1926, decedent negotiated for the acquisition of a costly tract of land, adjoining the office building above mentioned, for the purpose of providing for the enlargement of the office building and the bank.

Early in 1926, with his son, William Du Pont, Jr., and John W. McComb, decedent started what is known as the Westover Hills development, which has become a residential suburb of Wilmington. This development covered about seven hundred acres of ground owned by the decedent, and was planned by decedent to embrace adjoining tracts. He was chairman of the board of the company, looked after its financial operations, attended its meetings regularly, and went to the grounds several times a week to follow the progress of the work. It was anticipated that the development would take at least ten years for completion.

The decedent was also interested in the Miller Train Control Company and the Electro Company, both of which were engaged in scientific activities, and to which he devoted time and study.

(24) In 1928, the decedent built a greenhouse on his estate at Bellevue, Del., under a contract let in 1925, for the purpose of raising vegetables and fruit for his personal use, as he dwelt there alone. In the summer of 1927, he planned a trip around the world to take about two years.

(25) Decedent's health was unusually good. He was the type of man destined to long life. He belonged to a "long-lived" family. His brother, Colonel Henry A. Du Pont, fifteen years older, died at the age of ninety. Two of decedent's sisters are still living, one upwards of ninety-one years, and the other over eighty-six years.

(26) Dr. Alfred Stengel, professor of medicine and vice president for medical affairs of the University of Pennsylvania and most distinguished in his profession, had known Mr. Du Pont for twenty-five or thirty years. He had been his personal physician on the few occasions requiring his services, and was the physician of his children and grandchildren. He had attended him in 1917 for a casual illness. In 1918, he was called to the University Hospital at Charlottesville, Va., and found Mr. Du Pont suffering with some minor abdominal trouble. He removed him to the University of Pennsylvania Hospital, where he made a complete recovery after a short stay. At that time he had neither cardiac trouble nor arteriosclerosis. After 1918, Mr. Du Pont had no occasion to consult Dr. Stengel or any other physician until November 14, 1927, when he called on Dr. Stengel at his office in Philadelphia, and told him he had been under a terrible mental strain. He referred to the ordeal with Zinn and characterized it as "a gruelling experience of life." Decedent was immediately sent to the University of Pennsylvania Hospital and stayed there, except for one day, until early in January, 1928. The hospital report after the word "diagnosis" states "chronic myocardial disease—arteriosclerosis—hypertrophied prostate." Dr. Stengel testified that myocarditis is a condition of the heart constituting a normal function of age. From 1918 until the visit on November 14, 1927, decedent had shown

no evidence of myocarditis in any degree or heart disease of any kind, threatened or otherwise. During decedent's stay at the hospital, he made a "remarkable recovery from all of his cardiac disturbances" and at the time of his discharge his condition was such as to promise that he would make a complete recovery and live for an indefinite period of years.

(27) Decedent was not suffering from arteriosclerosis in November, 1927, not normal to his years. The enlarged prostate gland was not such as to shorten his life. Decedent was never told that he had myocarditis either at the time he was at the hospital in 1927 or at any other time, nor does the record show that the decedent knew or had any thought that he had such a condition.

(28) Early in January, 1928, decedent went to his winter home in Georgia, as was his custom for a number of years. Dr. Stengel engaged Dr. Ryan of Philadelphia to accompany decedent for the purpose of catheterizing him if necessary. Dr. Ryan was a urologist and not a heart specialist. Decedent's condition improved progressively after leaving the University of Pennsylvania Hospital. About noon on January 20, 1928, a few minutes after Dr. Ryan left Mr. Du Pont, he slumped out of his chair to the floor and died.

(29) Dr. Ryan signed the death certificate. It states as the cause of death "myocarditis" and as to duration "several years." Dr. Ryan knew that the decedent had myocarditis when he entered the University of Pennsylvania Hospital in November, 1927, but did not know how long that condition had existed. He regarded the death certificate as a pro forma matter and put down myocarditis on the spur of the moment, having in mind that a man of seventy years of age of necessity had myocarditis incident to such age, without its being pathological. Dr. Ryan had never treated decedent for any affection of the heart. His employment was for a distinctly different object.

(30) Hon. Charles M. Curtis, formerly chancellor of Delaware, drew the agreements of 1926 and 1927 embodying the trusts for Mrs. Somerville, William Du Pont, Jr., and his wife, Jean Liseter Du Pont. At the time these documents were prepared, Mr. Du Pont was in good health. He said nothing to Chancellor Curtis about death, or that the trusts were made because of fear of approaching death, nor did he discuss the saving of taxes in connection with the trusts.

(31) Mr. Du Pont's secretary saw him practically every day from 1921 until the time of his death. Decedent was active physically and mentally throughout this period, never talked of approaching death, or said that he might not live long.

(32) Dr. John S. Andrews had been intimate with decedent from 1898. He saw him on his return from Georgia in the spring of 1926. He visited him frequently at his estate at Montpelier, Va., and found him in excellent health. Dr. Andrews never treated the decedent professionally.

(33) Holy Trinity (Old Swedes) Church, mentioned in decedent's will, was built by the Swedes in 1698, and is one of the oldest churches in the United States in which services have been continuously held. It is a cherished historic monument as well as an active church. The parishioners are people of very limited means, and are unable to support it without financial help. The welfare of the church depends in large measure upon the character of the vicar in charge.

This suit arises under the Revenue Act of 1926. The provisions of that Act (section 302(c), 26 USCA § 1094(c) relevant to the issues raised are as follows:

"§ 1094. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—* * *

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Where within two years prior to his death but after February 26, 1926, and without such a consideration the decedent has made a transfer or transfers, by trust or otherwise, of any of his property, or an interest therein, not admitted or shown to have been made in contemplation of or intended to take effect in possession or enjoyment at or after his death, and the value or aggregate value, at the time of such death, of the property or interest so transferred to any one person is in excess of $5,000, then, to the extent of such excess, such transfer or transfers shall be deemed and held to have been made in contemplation of death within the meaning of this chapter. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two

years prior to his death but prior to February 26, 1926, without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this chapter."

Three questions are raised: First, the constitutionality of the second sentence of paragraph (c) of section 302 of the Revenue Act of 1926; second, if that provision be held unconstitutional, then whether the four transfers in trust were in fact made in contemplation of death; and third, whether the plaintiff was entitled to deduct from decedent's gross estate as a charitable bequest the annuity to the vicar of Holy Trinity (Old Swedes) Church of Wilmington, Del.

■ This court has heretofore held on demurrer that the above-mentioned provision of section 302, subdivision (c), is unconstitutional. 51 F.(2d) 867.

■ The transfers were made within two years of decedent's death, and made without full and adequate consideration. Being so made, under the statute they "shall, unless shown to the contrary, be deemed to have been made in contemplation of death." This is, however, a rebuttable presumption of fact and the burden of proof is on the plaintiff. Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184. What is the fact?

The phrase "in contemplation of death" has been considered by many courts, both state and federal, and the United States Board of Tax Appeals. Whatever conflict there may be in the reported cases as to the meaning of this phrase its meaning has been recently expounded, and a rule governing this court laid down by the Supreme Court of the United States in the case of United States v. Wells, 283 U. S. 102, 115, 51 S. Ct. 446, 450, 75 L. Ed. 867. Chief Justice Hughes there said: "The phrase 'in contemplation of death,' previously found in state statutes, was first used by the Congress in the Revenue Act of 1916, imposing an estate tax. * * * While the interpretation of the phrase has not been uniform, there has been agreement upon certain fundamental considerations. It is recognized that the reference is not to the general expectation of death which all entertain. It must be a particular concern, giving rise to a definite motive. * * * The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand.' "

In commenting upon the decision in this case, Judge Caffey, in Farmers' Loan & Trust Company v. Bowers (S. D. N. Y.), speaking from the bench with reference to the above rule laid down by the Supreme Court, well said:[1]

"Under what the Supreme Court has now laid down as the rule which necessarily governs the trial court, the transfer is not taxable unless the thought of death was the impelling cause of the transfer.

"The Chief Justice in writing the opinion evidently intended to emphasize that test. He repeated it over and over, with different phrases, throughout his opinion. It is significant that in every instance he employed 'the', —the thought of death must be 'the' impelling cause. Sometimes he spoke of 'cause,' sometimes he spoke of 'motive'; but in all instances, in the sense of intention on the part of the maker of the instrument, he used several alternatives for 'impelling'. He said, 'the inducing cause'; he said, 'the controlling motive'; he said, 'the compelling motive'; he said 'the dominant motive'; he said, 'the determinative motive.' It is clear beyond the possibility of controversy, therefore, that in order to tax a transfer the thought of death must be, in the various senses, all of which are consistent here, the motive or cause of the transfer which was uppermost and which brought it about. That conclusion as to the meaning of the statute is inescapable."

To the like effect are Rea v. Heiner (D. C.) 6 F.(2d) 389; Commissioner of Internal Revenue v. Nevin (C. C. A. 3) 47 F.(2d) 478; Meyer v. United States, 60 Ct. Cl. 474; Estate of Charles F. Roe, 14 B. T. A. 312.

■ Applying the rule of the Supreme Court, I conclude that the transfers in question were not made in contemplation of death. The record demonstrates clearly that decedent's motive in setting up the trusts to his son, daughter, and daughter-in-law was to place them on a footing of financial independence and relieve himself of the task of regularly drawing and delivering checks to them. There cannot be the slightest doubt but that the impelling cause of the creation of the Zinn trust was the settlement of vexatious and harassing litigation. The dominant and controlling motives for the transfers would animate a man who contemplated a continuance of life and who did not contemplate death.

---

[1] Orally.

Myocarditis is a normal characteristic of age, and refers to a weakening or gradual deterioration of the heart muscle. It is not looked upon as a disease until it outruns the average condition one would expect to find in any man over sixty years of age.

At the time the transfers were made, Mr. Du Pont was in excellent condition, both mentally and physically. He was actively engaged in business, not only in connection with matters occupying his attention from day to day, but planning for the future. From the slight illness he had in 1918, he had completely recovered, and resumed his normal business activities. While he had gone through an illness in the fall of 1927, he had, as his physician testified, so improved as to promise a full and complete recovery. His conversations with his friends and business associates gave no indication that he had any thought but that he would live for many years. Nowhere in the entire record is there any evidence that during the period in which the transfers were made the thought of death ever entered into his calculations.

The defendant suggests that there is no medical testimony as to decedent's condition between May 25, 1926, the date when the two trust agreements for decedent's son and daughter were executed, and November 14, 1927, the date when decedent called on Dr. Stengel and was sent to the University of Pennsylvania Hospital. It is true that there is no testimony of medical treatment given to the decedent during this period, but, under the facts, such period could only be covered by negative testimony, for there is affirmative testimony that Mr. Du Pont had no occasion for medical treatment from the time he was ill in 1918, until he called upon Dr. Stengel in November, 1927.

The defendant also asks the court to find that the controlling and dominating motive actuating the decedent in making the transfers in trust for his son, daughter, and grandchildren, was to effect a distribution of his estate, and thereby to save his estate to that extent from the payment of federal and state taxes. This finding is not justified by the evidence. Even if it could be found that the motivating cause of the transfers was a reduction of taxes, it would not be sufficient. It is only when contemplation of death is the motive, without which the conveyance would not have been made, that a transfer may be subjected to the tax. Spencer Borden, Jr., Executor, 6 B. T. A. 255; Vaughan v. Riordan (D. C.) 280 F. 742.

On the whole, I am satisfied that the plaintiff has sustained its burden and shown affirmatively that the four transfers in question were not made in contemplation of death.

The executor in its tax return has attempted to capitalize and deduct the present value of the annuity of $3,000 to the vicar of Holy Trinity (Old Swedes) Church provided for in item 6, paragraph (f) of decedent's will. To justify its return, it relies on section 303(a), paragraph (3) of the Revenue Act of 1926, 26 USCA § 1095(a) (3). That section provides a deduction for: "(3) The amount of all bequests, * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes."

The decedent annexed to his charitable bequest the condition that the bequest should lapse, unless the board of Trinity parish should continue for perhaps the next fifty years to pay the present salary of the rector of an ancient church located in a remote part of the parish. If the board shall discontinue that salary or any part of it, the charitable gift instantly lapses, although the board should be constrained to so act for sound and compelling reasons. In considering the right to exemption from taxation, what certain data are at hand? In capitalizing the annuity and arriving at the deduction of $56,042.10, the plaintiff assumed that the board of Trinity parish will continue to pay to the vicar the present salary for a long period in the future. The question arises whether a taxable who deliberately annexes such a condition to a charitable gift has the right to make such an assumption, and thereby escape taxation. I think not. Whenever a taxable claims exemption from taxation his claim must rest upon clear and certain grounds. His claim cannot rest upon the assumption of what third persons may continue to do over a long period of time. The record contains no data from standard mortality and experience tables, or calculations and testimony of actuaries on which the present value of this bequest may be determined.

In Humes v. United States, 276 U. S. 487, 494, 48 S. Ct. 347, 348, 72 L. Ed. 667, Mr. Justice Brandeis said: "Did Congress, in providing for the determination of the net estate taxable, intend that a deduction should be made for a contingency the actual value of which cannot be determined from any known data? Neither taxpayer, nor revenue officer—even if equipped with all the aid which the actuarial art can supply—could do more than guess at the value of this contin-

gency. It is clear that Congress did not intend that a deduction should be made for a contingent gift of that character."

I think the instant case is governed by the reasoning of the Supreme Court in the above case. The action of the Commissioner in disallowing any deduction in the executor's tax return on account of this item in decedent's will was correct.

### Conclusions of Law.

(1) The plaintiffs have fully sustained the burden resting upon them of showing that the four transfers in question were not made by decedent in contemplation of death.

(2) The four transfers in question made by the decedent were not made by him in contemplation of death.

(3) The property transferred by the decedent was not subject to taxation as part of the estate of William Du Pont, under the Revenue Act of 1926, and the collection of a tax based on the value thereof was without authority of law.

(4) The Commissioner of Internal Revenue lawfully refused and disallowed any deduction from decedent's gross estate by reason of the provision in item 6, subparagraph (f), of decedent's will.

(5) Plaintiff executor is entitled to a judgment against the defendant for a sum representing the tax paid by it arising from the inclusion in the estate of the decedent of the value of the property included in the four transfers in question, with interest thereon as provided by law, from the date on which the tax was paid.

If the parties can agree on the amount of tax recoverable by the plaintiff executor under the foregoing findings and conclusions of law, a stipulation may be filed setting out such amount, and judgment will be entered accordingly. If the parties cannot agree, the case will be set down for further hearing.