### KAUFMAN et al. v. REINECKE.
### REINECKE v. KAUFMAN et al.
#### Nos. 5002, 5003.

Circuit Court of Appeals, Seventh Circuit.
Jan. 23, 1934.

Dwight H. Green, U. S. Atty., of Chicago, Ill., and E. Riley Campbell, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (E. Barrett Prettyman, Gen. Counsel, Bureau of Internal Revenue, and P. E. Miller and William J. Duiker, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., of counsel), for Mabel G. Reinecke.

Robert L. Floyd, George K. Bowden, Vincent J. Heffernan, and Theodore T. Shields, all of Chicago, Ill., for Una Libby and Robert Libby Kaufman.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge.

The controversy relates to the federal estate tax upon the gross estate of Samuel R. Kaufman, deceased. The issues are whether, under section 402, Revenue Act of 1921 (42 Stat. 278) [1] an inter vivos gift of 4,434 shares

---

[1] "Sec. 402. That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property—
\* \* \*

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without

of corporate stock of Congress Hotel Company to the wife by the deceased, made within two years of his death, was in contemplation of death and therefore includable for taxation in his gross estate, and whether certain real estate held by deceased and his wife by the entirety was includable in his gross estate.

The Commissioner included the items in the gross estate and found a deficiency accordingly, and upon appeal the Board of Tax Appeals held both items were properly included. 5 B. T. A. 31.

The order of the Board was not then reviewable by the Circuit Court of Appeals and. the tax having been paid, suit to recover it back was brought in the District Court against the Collector of Internal Revenue of the revenue district wherein it was paid. The court held that the stock was transferred by deceased in contemplation of death and was includable for taxation in the gross estate, denying recovery therefor, from which holding the executors appeal (No. 5002); and that the real estate held by the entirety was not includable, giving judgment for the executors for the tax paid thereon, wherefrom the Collector appeals (No. 5003).

Deceased, a resident of Chicago, died April 29, 1922, aged 58 years. By his will, executed about five months previously, his property passed to his wife and their three children. The wife and the elder son were made executors, but the son, not then having reached his majority, could not qualify under the law of Illinois.

In scheduling the gross estate, the executrix, his wife, did not include 4,434 shares of the stock of Congress Hotel Company, valued at $443,400, and 400 shares of Chatham & Phenix National Bank stock, valued at $94,800. The Commissioner increased the value of the gross estate by including therein these amounts and the real estate held by the entirety, which resulted in a substantial deficiency. The bank stock is not here involved.

In October, 1915, deceased and his brother Nathan, who held stock in the hotel company, made an agreement that in case of the death of either the stock of the one dying might be purchased by the survivor at the par value thereof, the purchaser to give his ten-year note therefor, stock represented by any stock dividend to be included without cost. Nathan died in 1918 owning 5,900 shares, of which

Samuel purchased 4,371 shares, giving his note therefor. In 1919 a 50 per cent. stock dividend was declared, and, after Samuel's death, these original and dividend shares were transferred to the payee of the note, who surrendered and canceled the note.

In 1918 Samuel and three other brothers, all holding hotel stock, entered into a contract similar to that with Nathan. One of these brothers died, and, pursuant to the agreement, his stock passed to the survivors.

Samuel became worried by reason of the fact that his then holding of the stock (14,000 shares) was much more than that of the brothers, and in case of his death his surviving brothers could buy his stock at a price much less than he deemed its value to be, whereby his own family would, as he thought, be unduly deprived. He consulted his attorney, who advised him the contract was effective only as to such stock as the one dying had at the time of his death, and that stock disposed of before his death would not be subject to the agreement. The attorney further advised him that, as he had for some time contemplated giving a portion of his Congress Hotel stock to his wife, it would be well for him to carry out this intent and give it to her at once, and thus relieve those shares from the burden of the contract. He thereupon made plans to arrange his indebtedness secured by such stock so that he would have some of the stock clear. By December, 1921, he had free from his obligations the 4,434 shares of the stock which he thereupon procured to be transferred to his wife on the books of the company. In the same month he took the stock certificates to New York, where she then was, and gave them to her, saying to her, "There is the stock I have been promising you for so long." She then placed the certificates in her safety deposit box in New York with her other valuables, to which she alone had access, and there, up to her husband's death, it remained.

On April 20, 1920, deceased made a gift to his wife of $84,500 of Liberty bonds, which in 1921, upon his advice, she exchanged for the Chatham & Phenix Bank stock, which was held to be no part of the gross estate.

In 1916 Samuel became ill and his appendix was removed. From this he fully recovered. In 1919 he was indisposed with a cold and was examined by his physician, who found he had a slightly enlarged liver. He had no further illness until the spring of 1921, when he contracted influenza, from which he apparently recovered, and he then went to New York, where he suffered a relapse and

such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title; "(d) To the extent of the interest therein held jointly or as tenants in the entirety by the decedent and any other person. * * *"

developed an intestinal condition which involved the gall ducts and produced jaundice. He also had erysipelas in the ear and neck, and poisoning, which caused him to be delirious for several weeks, involving nearly every organ of the body. This illness covered April and part of May, 1921. Thereafter he steadily improved, and he went to his summer camp in Michigan, as was his custom; and on his return to Chicago in October his health was better than before his illness. He continued in active management of his large affairs, particularly in the management of the Congress Hotel and several other business ventures, and enjoyed and continued to enjoy good health to the night of April 29, 1922, when he was suddenly stricken and died in a few hours from gastric hemorrhage, an ailment which does not appear to have had relation to any prior illness.

On January 1, 1922, the hotel company declared a 4 per cent. dividend, amounting on these shares to $17,737, which, at the request of deceased, was paid by the hotel company to him. On April 1, 1922, a further dividend of 2 per cent. was declared, which was likewise paid to him, both sums being deposited in his bank account.

■ The Board of Tax Appeals, after finding the facts, reached the conclusion and held that this gift of stock was not made by deceased in contemplation of death, but that by reason of the fact of his drawing the dividends after the transfer of the stock the transfer was one intended to take effect in possession or enjoyment at or after his death, and was therefore taxable under the statute.

This reason for the Board's holding is not now, nor was it in the District Court, urged by the Collector in support of the inclusion of the shares in the gross estate. Under the decision by this court in Hodgkins v. Commissioner, 44 F.(2d) 43, 45, and Smith v. Commissioner, 59 F.(2d) 533, 536, such contention could not have been maintained.

■ The findings and opinion of the Board were in evidence before the District Court, and no evidence was offered in that court which tended to overcome the Board's conclusion that the transfer was not made in contemplation of death. It is contended for the executors that in this state of the record the court was bound to accept the conclusion on that subject which the Board reached. With this contention we are not in accord.

· The Board's finding on this subject is its conclusion from the specific facts which it found; and the statute makes the findings

prima facie evidence. This would not preclude the court from hearing other evidence bearing on those findings, nor from reaching an ultimate conclusion different from that reached by the Board, upon the facts as they were found by the Board. If it were otherwise, then in the suit of a taxpayer for refund of taxes paid the court would practically be precluded from reaching a conclusion different from that reached by the Board, unless before the District Court further evidence was adduced to overcome the prima facie effect of the Board's findings. If the District Court may not reach its ultimate findings from the evidentiary facts as found by the Board, the statute giving to the taxpayer the action for refund would be a practical nullity where no further evidence was heard by the court.

If no other evidence is adduced before the court than that afforded by the findings of fact by the Board, it is nevertheless for the court to determine whether, upon this evidence, the proper conclusion was reached; and upon appeal from the judgment of the District Court thereon it is for this court to examine the facts as the record shows them to be, and therefrom determine whether in its judgment the District Court reached the proper conclusion.

■ What is a gift in contemplation of death has been many times considered by the courts. A definition which would cover all circumstances which may arise could not be formulated. In United States v. Wells, 283 U. S. 102, at page 119, 51 S. Ct. 446, 452, 75 L. Ed. 867, it was said:

"There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute."

This quotation is preceded by a discussion so cogent and clarifying in its application to the instant case that we specially refer to so much thereof as begins at the bottom of page 117 of 283 U. S., 51 S. Ct. 452, with the words "old age," and continuing to the beginning of the above quotation on page 119 of 283 U. S., 51 S. Ct. 452, although the entire opinion, which is quite lengthy, is highly illuminative.

There is striking parallel between the facts in the Wells Case and those here. Wells died August 17, 1921, leaving a wife and five children, and Kaufman on April 29, 1922, leaving a wife and three children. Each had had at intervals several illnesses, some quite serious, up to about six months preceding the transfer, and each lived some five months or

more thereafter. Wells had been informed a few months before his transfer that he had cancer of the bowels, although at the time of the transfer he had been told he was about cured, and he felt well and transacted his business affairs, which were considerable. Kaufman also had spells of specific illness, at least one of them quite serious, but from which he had fully recovered, and for about seven months prior to the transfer he was apparently well and attended to his large affairs, including the management of the Congress Hotel at Chicago. Each of them had previously given a large amount to members of their respective families—Wells to his children, and Kaufman to his wife for the use of herself and children, having given them $84,500 in United States bonds over two years before his death. Wells' gift of stocks to his children was about half of his million dollar estate, and at about the same time he made this gift he made his will and a property settlement with his wife; and Kaufman's gift of the 4,434 shares was about half of his gross estate, and he then also made his will as heretofore stated.

In each case there was evidence of a specific motive for the making of the transfer, other than contemplation of death. Wells wished his children, while he was living and could advise them, to have experience in handling property in order better to qualify them for property management while he lived, and for managing what they would receive on his death. Kaufman had promised to give his wife shares of the Congress Hotel stock, and he had the further motive of relieving so much of the stock as he would give her from the contractual option of his brothers to purchase the stock in case they survived him.

But counsel for the government contend that this very motive indicates that the transfer was made in contemplation of death, since the contracted option for purchase would become effective only in case of his death leaving one or more of his brothers surviving. Indeed, this is the main, if not the sole, reason advanced in support of the proposition that the transfer was in contemplation of death. We cannot see it in this light. What decedent sought to achieve in this respect could not have been effected by will. No testamentary disposition could have relieved the stock from operation of the option, which the decedent had conceived to be a substantially detrimental element in the value of the stock. He had taken up with his brothers the matter of eliminating the option, but without result up to the time of the transfer. A transfer of the stock made with the view of relieving it from the potential option of the contract is not in the nature of a testamentary disposition of the stock, and such a motive is not to be regarded as indicating a transfer in contemplation of death, but rather a transfer made in contemplation of the contract.

In this respect the situation is again quite comparable to that in the Wells Case. Wells wished his children to have the experience of managing property while he was yet alive and could advise them, so that after his death they would be better able to manage it, and any other property he would leave them. While, of course, he realized that some time he would die, yet the transfers he made were not for any such reason alone in contemplation of death, within the construction given that phrase by the Supreme Court in deciding the Wells Case against the contention that the transfer was there made in contemplation of death, reversing the lower court which had decided otherwise.

In one significant respect there is a decided difference between the cases. At the time of the respective transfers Wells was aged 73 and Kaufman 58. While it is true, as said in the Wells opinion, that "old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test," yet in a donor at 58 contemplation of death would not be so readily inferred as in one at 73.

Where the motivating cause for the transfer is something other than the transferor's contemplation of his death, be such cause laudable or otherwise, the statute can have no application, and the transferred property may not be included for taxation in the transferor's gross estate.

We are satisfied that upon this record, on the authority of United States v. Wells, the rebuttable statutory presumption of contemplation of death, where the death ensued less than two years after the transfer, has been overcome, and that a motivating cause for the transfer other than contemplation of death definitely appears.

Respecting the appeal of the government from so much of the decree of the District Court as awarded refund for the tax paid on the real estate held by Kaufman and his wife as tenants by the entirety, we conclude that the case is governed by the decision of the Supreme Court in Griswold v. Helvering, Commissioner, 290 U. S. 56, 54 S. Ct. 5, 78 L. Ed. —— (decided November

6, 1933—after the District Court's decision herein), affirming the decision of this court in the same case. 62 F.(2d) 591. In that case, as here, the tenancy was created prior to 1916. It was there held that, since the acts passed after that year and prior to the death did not purport to be retroactive, provision in those acts for including in the gross estate the whole property held by the entirety did not apply to such tenancies as were created before 1916, and that thus only half the value of such property was includable in the gross estate of the deceased tenant by the entirety.

The death here occurred while the statutory provisions were the same as in the Griswold Case. The District Court held that no part of the real estate was includable in the gross estate of deceased for taxation, and gave the executors judgment for $291, which was the amount of the tax which had been assessed and paid. Under the Griswold Case we conclude that the refund should be for one-half thereof, $145.50.

The judgment is reversed, and the cause is remanded to the District Court with direction to award a judgment for the tax paid upon said shares of stock of the Congress Hotel Company, plus $145.50 of the tax paid on the said real estate, together with statutory interest on both amounts.

EVANS, Circuit Judge (dissenting).

Only a simple question of fact is before us. Was Kaufman's conveyance of property of the value of $443,400 a few months before he died a transfer in contemplation of death? Not only do I think Judge Barnes was justified in answering this question, as he did, in the affirmative, but it seems to me that the evidence—unsupported by the District Court's findings—necessitated such a conclusion.

The court, in its twenty-third finding, found:

"The transfer of 4434 shares of stock of Congress Hotel Company, transferred in December, 1921, by the decedent to his wife, was made by the decedent in contemplation of death."

A similar conclusion of law was made by the court.

No disagreement with the majority opinion exists over its conclusion that the trial court might differ on this issue with the Board of Tax Appeals, although the evidence be the same. The weight which an appellate court should give to a trial court's findings, in view of the contrary views of another fact finding tribunal, was doubtless somewhat lessened.

Uihlein v. General Electric Co. (C. C. A.) 47 F.(2d) 997.

In this case it seems to me that the Board's expression of views in its opinion (not supported by a finding) was obiter dictum, and moreover, the evidence before it was not the same as before the District Court.

I cannot accept, with the same persuasive effect as my brethren, the decision in the case of United States v. Wells, 283 U. S. 102, 51 S. Ct. 446, 75 L. Ed. 867. There are similarities between that case and the facts in the instant appeal, it is true, but we are dealing with an issue of fact, not with a legal principle.

It is well nigh impossible to find two cases where the facts are identical. Even though the spoken words of witnesses be the same, the variance in the integrity of the speakers makes it impossible for a court to give the same weight to the same answers. To illustrate: Take two criminal cases wherein the defendant in each case takes the stand and denies the facts which, if undisputed, would establish his guilt. A jury or a court would be a most unusual one, if it relied solely or even largely upon the spoken word of the witness or the accused. Rather must guilt depend upon the jury's faith or lack of faith in the individual who spoke the words. It is for this reason that precedents in cases involving issues of fact are not impressive.

Whether a gift be in contemplation of death presents a question of fact which is not unlike a question of accidental or suicidal death. Of necessity, there is considerable doubt as to the correct answer. No living witness can testify with much cogency as to the deceased's intentions. Only those circumstances from which inferences are deducible may be shown, and all such circumstances are peculiarly within the knowledge of those interested in establishing the negative side of the proposition.

As a background of all discussion and all deductions is the fact that the deceased, by a transfer shortly before his death, relieved his widow of a substantial inheritance tax—in this case some $25,000.

The last sentence of section 402 (c), in effect when Kaufman died, is significant:

"* * * Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, *made by the decedent within two years prior to his death* * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title."

Various states have adopted different periods of time within which such a presumption will arise. In Schlesinger v. Wisconsin, 270 U. S. 230, 46 S. Ct. 260, 70 L. Ed. 557, 43 A. L. R. 1224, the court considered the validity of a Wisconsin statute which provided that a transfer executed within six years of death was *conclusively* presumed to be made in contemplation of death. It was held that such a statute violated the Fourteenth Amendment. A conclusive presumption is, however, vastly different from the rebuttable presumption which arises by virtue of death within two years (and in the instant case, within six months) from the date of the gift. Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772. I think it significant in any case (and the instant case is no exception) that death followed shortly after a large gift. The size of the gift, the closeness of the death to the date of the gift, are the significant facts, which must ordinarily affect the persuasiveness of the presumption of reasonable observers. Presumptions of fact from the establishment of other facts are the reasonable deductions of ordinary men and are based upon the experiences and observations of the mass of humanity. In the present case the deceased had been sick, most seriously ill—nigh unto death—a few months before. When able "to get up and about" after this illness, he made this large gift. Within five months thereafter he died. He did not die from an accidental cause, but from a physical ailment. His last illness was short. His death was sudden, but, in view of his previous serious illness, not surprising. May it not be fairly inferable that deceased had heart trouble or other warnings of such a death, even though he thought it best not to worry other members of his family or his intimates with a recital of his afflictions? There are, fortunately, many of this rugged type who bear their cares and their burdens alone.

There are, too, additional facts which are somewhat illuminating. Although deceased had signed the certificates of stock, worth $443,400, over to his wife, he instructed the secretary of the company which issued the stock, to pay all dividends declared on this stock to him. After the assignment of stock was executed in December, he collected and retained a four per cent. dividend which was declared in January and a two per cent. dividend which was declared in April on the 4434 shares of stock previously transferred. Are there no inferences to be drawn from these facts which indicated the gift was in contemplation of death? Surely deceased would not have attempted to reserve the life use of this property in this indefinite, clumsy way had he not believed his life was of short duration.

Then, too, the oral evidence respecting differences with his brothers and his desire to avoid the agreement with them, and which agreement became operative *in case he died before they did*, is not helpful to appellants.

It seems that the brothers had entered into an agreement whereby the surviving brother or brothers could purchase, upon the death of either of the others, the stock he held at death, at a price well below its market value. To avoid the effect of this agreement, appellants' witness testified that deceased transferred this stock. *But the agreement was not effective unless he died.* Was there something he knew which made him believe he would die before his brothers? In the absence of any spoken word must the court not look to his acts?

This witness said the deceased transferred his stock because he wanted to avoid or lessen his income taxes, and because he wished to avoid the agreement with his brothers which would affect his estate in case of his death. Similar motives would have prompted him to attempt to avoid his inheritance taxes. Nor is it reasonable to attribute to him a desire to avoid a solemnly executed agreement with his brothers, which became effective only upon his death, if he had no expectations of an early death. If avoidance of an agreement with his brothers were prompted by mercenary motives, action taken to avoid the agreement must have been on the assumption that he would die before they did; otherwise he would have profited by the enforcement of the agreement.

The foregoing reasons are advanced not merely to establish the fact which the District Court found, but to show there existed evidentiary support for such finding. The action was one at law. The parties waived a jury trial. The decision of the trial court on an issue of fact was therefore not reviewable, save to ascertain whether there existed any substantial evidence to support it. Perkins v. Prudential Insurance Company of America (C. C. A.) 69 F.(2d) 218, decided January 19, 1934. This was not the situation on the appeal of the United States in the case of United States v. Wells.