## WISHARD v. UNITED STATES.

No. 8456.

Circuit Court of Appeals, Seventh Circuit.

July 10, 1944.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Homer R. Miller, and Helen R. Carloss, Sp. Asst. Attys. Gen., all of Washington, D. C., and B. Howard Caughran, U. S. Atty., of Indianapolis, Ind., for appellant.

Robert D. Armstrong, and James W. Noel, both of Indianapolis, Ind., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Plaintiff filed a timely claim for refund of federal estate taxes which the Commissioner rejected. He thereupon brought suit and judgment was entered in his favor. To reverse this judgment, defendant appeals.

On April 30, 1931, William Niles Wishard, then aged 79, purchased for a single premium cash payment of $26,250 an annuity contract which provided for a monthly annuity payment of $72.92, payable and paid to him, as provided therein, until February 20, 1934. On that date, at Wishard's request, the policy was rewritten. According to the revision, the annuity was thereafter to be paid, and was paid, $32.92 each month to his wife and $40 each month to his sister. Specific provisions were included to designate the beneficiaries who

were to get the income in the event that his wife or his sister should not be living. The specific details of these provisions are not important.

Special Provision B, one of the options of settlement of the death benefits, related to the payment of interest on the funds after Wishard's death. The rights of the wife to draw on the principal were set out and the contingencies provided for under which certain designated beneficiaries might be entitled to draw the balance of principal and interest not already withdrawn. Under some contingencies the entire fund was payable at Wishard's death. Under others it remained in the insurance company, the interest and parts of the principal being paid under specified conditions.

The most significant part of the revision of February 20, 1934, was that Wishard gave up the right to change the beneficiaries and to elect one of several modes of settlement of the death refunds, and thereafter neither he nor the beneficiaries had the right to cash, assign or pledge the contract. He retained no incident of ownership or control whatsoever. None of the minimum refund could at any time under any contingency revert to him or to his estate, but all unexhausted portions of the minimum refund could be paid only to the executor, administrator or personal representative of the last to survive of any beneficiary of the policy. Hence Wishard had no right, title, or interest in or control over the policy or the proceeds thereof after February 20, 1934.

Wishard died on January 22, 1941. He was survived by his widow, two sons, and sister. The minimum death benefits under the contract, due at his death, including dividends, totalled $25,124, so that if plaintiff's position is sound, he is entitled to recover $3,156.88.

The Commissioner included $25,124 in Wishard's gross estate on the theory that the transfers were taxable under the provisions of Section 811(c) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 811(c).[1]

■■■■ Defendant's principal contention is that this transfer of February, 1934, was a transfer in contemplation of death because there is no substantial evidence showing that the dominant motive for the transfer was associated with life, and defendant correctly asserts that the burden of proving that this was not a transfer made in contemplation of death was on the plaintiff, even though the transfer occurred more than two years before decedent's death. Smails v. O'Malley, 8 Cir., 127 F.2d 410; Oliver v. Bell, 3 Cir., 103 F.2d 760. By finding that the transfer was not made in contemplation of death, the trial court held that plaintiff had sustained this burden. Because of this holding, the evidence and the inferences to be drawn therefrom must be viewed in the light most favorable to the plaintiff.

The undisputed evidence shows that at the time of the transfer and for several years before and after, Dr. Wishard was a specialist who practiced his profession with three other doctors and operated a clinic in Indianapolis. He was a member of the staff of City Hospital in Indianapolis, supervised and frequently visited a clinic in the hospital, and was also on the staff of the medical school at City Hospital. Moreover, he was a member of the Advisory Council of the Methodist Hospital, chairman of the committee on professional standards, and visited patients at the hospital up to the last year before his death. From 1932 to 1934 he frequently visited his bank, purchasing bonds and stating to his banker that he was interested in the purchase of long term securities. He never made any statements to his banker about dying. From 1932 to 1940 he attended meetings of the State Medical Association with regularity, being chairman of its bureau of publicity. He delivered several addresses from 1933 to 1938, his practice being to dictate them to his secretary, following which he committed them to memo-

[1] The section provides that "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, * * * To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, * * *."

ry and delivered the addresses without notes. He traveled quite often; in 1937 he made a trip to New York and to the West Coast with his wife. It was only when, on rare occasions, he had a bad cold or was extremely tired that he was absent from his work for brief periods. Witness after witness gave testimony which supported the conclusion that for a man of his years Wishard was an extraordinary person, remarkably active and alert both mentally and physically.

Wishard's will was not executed until September, 1940, over six years after the transfer. Furthermore, the will's provisions were far from identical to those of the annuity policy. Although both his wife and sister benefited by both, the sister benefited proportionately far more by the annuity than by the will. It would seem perfectly natural that his wife, his children, and his sister would be the objects of his bounty whether the transfer was actuated by a life motive or in contemplation of death.

Less than thirty per cent of the decedent's estate, as valued at the time of his death, was transferred by the change in the policy. Near the turn of the century the decedent had taken out life insurance policies in favor of his wife and sister. Hence the annuity policy could not be said to be designed to serve merely as ordinary insurance. On the contrary, it was presently operative during his lifetime.

Both sides concede that the leading case to be considered is United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867, in which the Supreme Court stated:

"As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated,' that is the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body or mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or non-existence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death." 283 U.S. at page 117, 51 S.Ct. at page 451, 75 L.Ed. 867.

"It is apparent that there can be no precise delimitation of the transactions embraced within the conception of transfers in 'contemplation of death,' * * *. There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute." 283 U.S. at page 119, 51 S.Ct. at page 452, 75 L.Ed. 867.

Section 81.16 of Treasury Regulations 105 contains the same test.[2]

Certainly decedent's physical and mental condition was excellent. Even if we should adopt defendant's contention that we should exclude as unsupported by evidence the court's findings that decedent's father was a physician in active practice until his ninety-fourth year, that the family history was one of long life, and that decedent died after an illness of six days from a coronary occlusion resulting in cardiac failure followed by terminal pneumonia, there is adequate evidence to show that decedent was not in any fear of death at the time of the transfer. The court's finding that on February 20, 1934, at the time of the revision of the policy, the decedent was possessed of unusual vigor is well supported by evidence. Decedent's bodily condition was in no way impaired until just prior to his death in 1941.

■■ The task of reconstructing a dead man's motive in making a transfer seven years before his death is a difficult one. But there is no evidence here to show that the transfer was made in contemplation

---

2 "The phrase 'contemplation of death,' as used in the statute, does not mean, on the one hand, that general expectation of death such as all persons entertain, nor, on the other, is its meaning restricted to an apprehension that death is imminent or near. A transfer in contemplation of death is a disposition of property prompted by the thought of death (though it need not be solely so prompted). A transfer is prompted by the thought of death if it is made with the purpose of avoiding the tax, or as a substitute for a testamentary disposition of the property, or for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized to determine whether or not such thought prompted the disposition."

of death. True, decedent was 82 years of age when the transfer was made. But it is well settled that advanced age of itself is not the decisive test in determining whether contemplation of death was the principal motivating cause of a transfer. United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867; Heiner v. Donnan, 3 Cir., 61 F.2d 113; Kaufman v. Reinecke, 7 Cir., 68 F.2d 642; Nevin, Ex'r of John Wanamaker Estate v. Commissioner, 16 B. T. A. 15; Charlotte C. Lozier Estate v. Commissioner, 7 B. T. A. 1050; Edward Moore Estate v. Commissioner, 21 B. T. A. 279. Nor does the mere fact that Special Provision B, in connection with defining contingencies under which the rights of the beneficiaries to share in the proceeds of the policy come into existence, refers to the decedent's death seven times necessitate the conclusion that contemplation of death induced the transfer. This shows merely that general apprehension of death of which Section 81.16 of Treasury Regulations 105 speaks as not sufficient to bring a transfer within the statute. Nor are we impressed by defendant's argument that decedent could have achieved the desired result by a simpler method if his motive was to give his wife and sister an income for life. For he had the right to give them whatever he wanted in whatever manner he chose, and there is no evidence whatever suggesting that decedent was motivated by a desire to escape estate taxes.

On the other hand, there is sufficient evidence to afford the basis for drawing the inference that decedent was actuated by life motives in making the revision of the policy. Everything decedent did was consistent with the idea that he expected to live and be active for many years. His health, energy, vigor and activity militate against considering this transfer as one made in contemplation of death. Hodgkins v. Commissioner, 7 Cir., 44 F.2d 43; Smith v. United States, D.C., 16 F. Supp. 397; Estate of Katharine H. Talbott v. Commissioner, 42 B. T. A. 1081; Estate of Herbert G. Lowe v. Commissioner, 38 B. T. A. 117. Naturally Dr. Wishard felt an obligation to provide for his wife and sister, and the amendments to the annuity contract in 1934 strongly suggest that his purpose was to provide an independent income for them immediately, without their being compelled to await his death and without consideration of that particular event. This is a motive associated with life. United States v. Wells, supra; McGregor v. Commissioner, 1 Cir., 82 F.2d 948; Loetscher v. Burnet, 60 App. D.C. 38, 46 F.2d 835; Delaware Trust Co. v. Handy, D.C., 53 F.2d 1042. It should be borne in mind that this transfer occurred in February, 1934, when the depression was causing great concern, both presently and for the future. What Dr. Wishard did was to make it impossible for him to resort to this policy as a source of funds. This circumstance permits of the inference that what was uppermost in his mind was to make sure that whatever financial vicissitudes he might later encounter, his wife and sister from that date forward would have a certain definite income. This is a life motive, Brown v. Commissioner, 10 Cir., 74 F.2d 281. The fact that Dr. Wishard did not execute the will until six years after this transfer also tends to show that the transfer was not in contemplation of death especially since the will's provisions and the annuity's provisions were different. Root v. United States, D.C., 56 F. 2d 857. In view of the numerous activities of Dr. Wishard, there is a basis for the inference that the revision was made in order to relieve him of the necessity of taking time to give certain payments to his sister and wife. This motive, too, is associated with life. Delaware Trust Co. v. Handy, supra. Taking all of the evidence into consideration we think the court was justified in inferring that Dr. Wishard was actuated in making the revision by motives associated with life rather than death.

Defendant's next contention is that the revision was a transfer intended to take effect in possession or enjoyment at or after the transferor's death. Two arguments are offered in support of this position. The first made in the brief, is that since the beneficiaries prior to decedent's death never had any rights to cash the policy, pledge or assign it, or alter its terms, their right to enjoyment was postponed till after the decedent's death. Plaintiff, on the other hand, asserts that there was a completed transfer to the beneficiaries during decedent's lifetime. This position is sound, for in Reinecke v. Northern Trust Co., 278 U.S. 339, 49 S.Ct. 123, 73 L.Ed. 410, 66 A.L.R. 397, which is concededly applicable here, the Supreme Court held that where a grantor of a trust parted with both possession and beneficial interest in property when the trust was created, the mere passing of possession or enjoyment in the trust fund from the life tenants to the remaindermen after the grantor's

death, as directed in the trust instrument, is not sufficient to subject the property to inclusion in the grantor's gross estate as a transfer intended to take effect at and after death. As we recently held in Commissioner v. Lasker's Estate, 7 Cir., 141 F.2d 889, Reinecke v. Northern Trust Co. has not been overruled by Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368. Faced by the Lasker's Estate case, counsel, on oral argument, very wisely abandoned this argument.

■ The second point is that if decedent's controlling motive was to provide an independent life income for his wife and sister because of his obligations toward them, there was a sufficient retention of the use, possession and right to the income to bring the case within the provisions of Section 811(c) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 811(c). The argument is that because Section 81.18 of Treasury Regulations 105 provides that "The use, possession, right to the income, or other enjoyment of the property will be considered as having been retained by or reserved to the decedent to the extent that during any such period it is to be applied towards the discharge of a legal obligation of the decedent, or otherwise for his pecuniary benefit," and because Section 811(c) provides for inclusion in the gross estate of property transferred by decedent where he retained for his life or any period not ascertainable without reference to his death or for any period which does not in fact end before his death, the right to the income from the property, decedent should therefore be held to have transferred an interest in property intended to take effect in possession and enjoyment at or after his death and in which he retained for his life the possession or enjoyment of the right to the income from the property. This argument is unsound for the reason that Dr. Wishard retained nothing. He completely divested himself of any right to say how the income payments were to be used by the beneficiaries. This distinguishes the instant case from the cases cited, for in Estate of Helfrich v. Commissioner, 7 Cir., 143 F.2d 43, the decedent, who was the settlor-trustee, retained during his life the power to manage the funds and to say when, in what amount, and for what purpose they should be paid out, so long as the use was consistent with the beneficiaries' interest, and in Helvering v. Mercantile-Commerce Bank & Trust Co., 8 Cir., 111 F.2d 224, the decedent-grantor retained a possible right to regain the corpus, the right to terminate the trust at any time with his wife's consent, and expressly provided that the income was to be used by the wife for family expenses and her own support. There, although he didn't do it, he could have insisted upon the income being used to discharge his legal obligation to support his wife. In our case, Dr. Wishard completely surrendered all rights pertaining to this annuity contract. The annuitants had the unfettered right to use the payments in any manner they saw fit. No obligation was placed upon them to use the money to support themselves, nor is there any showing that this was the purpose of the annuity. An independent income is different from an income to be used for support. Perhaps decedent gave his wife and sister additional money for their support. Certainly he was financially able to do so. He may have been motivated by the thought, at the time of the transfer, that his wife and sister could use the annuity payments for their support if it should prove necessary. But when the depression passed, it did not prove necessary. Section 81.18 of Treasury Regulations 105 seems clearly to contemplate that there should be some restriction in the trust instrument or instrument of gift that the property be used in discharge of a decedent's legal obligation or for his pecuniary benefit. No such restriction appears here. Hence we cannot say that the revision of this annuity contract was a transfer falling within Section 811(c).

■ Another question is raised. It arises out of the valuation of a different annuity policy. In 1932 Dr. Wishard and his wife purchased this policy from the Equitable Life Assurance Society for $5,000, each paying one-half. Wishard was then 80 years of age and his son, the annuitant, was 31. Annuities of $126 per month were payable to the son for his life, beginning on the anniversary of the contract nearest the son's 65th birthday. If the annuitant was not living on that date, the annuities were payable to Wishard and his wife or the survivor, and if neither survived, it was payable to annuitant's wife, and if she was not living, to annuitant's children or their survivors. Prior to the due date of the annuity payments, the policy could be surrendered by the purchasers for the cash value. Upon the death of either Wishard or his wife, the survivor had the same rights. Such action would thereby de-

feat and exclude all rights of the annuitant to the annuities. After May 25, 1955, the annuitant could assign or cash the policy provided neither of the purchasers were then living.

At Wishard's death, the cash surrender value of the policy plus dividends was $6,503.80, one-half of which is $3,251.90. The court found that this was the proper value. One-half of the cost of a comparable policy sold by the Society, which was regularly engaged in selling policies of this nature, was $5,174.09.

On the date of Wishard's death, neither he nor his wife had exercised their rights under the policy to cash it for its surrender value or make loans against it, and the annuitant and Wishard's widow were both living.

Defendant contends that the court should have found that the value of decedent's interest in the policy was $5,174.09, which was the stipulated cost of one-half of a comparable policy on the date of decedent's death.

Plaintiff concedes the reasonableness in the ordinary case of Section 81.10(i) (2) of Treasury Regulations 105 which provides that annuity contracts are to be valued for estate tax purposes on the basis of sales of comparable contracts by companies engaged in the business of selling such contracts, and he does not question the validity of the regulation. But he contends, and the court held, that the instant case is not covered by the regulation. The regulation was not intended to cover the present situation because here the co-purchaser, Mrs. Wishard, wife of the decedent, was the transferee of the transfer sought to be taxed.

The vital point is that by the terms of the policy Mrs. Wishard took nothing but the right to surrender the interest so transferred at the cash value stated in the policy, which was $3,251.90, being one-half the total cash surrender value at the time of decedent's death as stated in the policy. The case of Mearkle's Estate v. Commissioner, 3 Cir., 129 F.2d 386, relied on by defendant, is clearly distinguishable. That case concerned an entirely different type of annuity contract. It provided for payments to decedent's wife. Here, no payments were to be made to Mrs. Wishard. Here, payments were to be made to Dr. Wishard's son beginning at the age of 65, providing that Mrs. Wishard should not have cancelled the policy by taking the cash surrender value. If she did this, the son got absolutely nothing. Moreover, in the Mearkle case the wife was not a co-purchaser.

Nor do the gift tax cases cited by defendant[3] compel a different result from that reached by the District Court. Those cases involved a different statute and different regulations. Furthermore, the gifts were made to the donee-beneficiaries so that their interest ripened immediately or on the donor's death, whereas here the transferee, Mrs. Wishard, was not the donee-beneficiary of the annuity payments, save on an extremely remote contingency, namely, that her son should predecease her and she should be alive at the time when her son would have reached 65 years of age if he had lived. The interest Mrs. Wishard took was the right to obtain one-half the cash surrender value, not the right to the annuity payments or the face amount of the insurance policy which the donees in the gift tax cases received. Here, the beneficiary's right to receive the annuity payments did not ripen on Dr. Wishard's death. It was not to ripen for many years, not until the son, who was the annuitant, reached 65 years of age.

The shift in economic benefits which occurred on decedent's death was the transfer to Mrs. Wishard of the right to obtain the proceeds of the half interest which had belonged to the decedent. Certainly the interest must be valued in the condition in which it passed to the transferee, and here that is the cash surrender value of one-half of the annuity contract. Realistic appraisal necessitates this conclusion. Therefore, the District Court's determination is correct.

The judgment is affirmed.

---

[3] Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813; United States v. Ryerson, 312 U.S. 260, 61 S. Ct. 479, 85 L.Ed. 819; Powers v. Commissioner, 312 U.S. 259, 61 S.Ct. 509, 85 L.Ed. 817.