BLACK et al. v. UNITED STATES.

No. 22081.

District Court, N. D. Ohio, E. D.

July 16, 1946.

1931, Public No. 131 Seventy-First Congress, and by Section 803(a) of the Revenue Act of 1932, and under the provisions of Section 811(a) and (c) of the Internal Revenue Code [26 U.S.C.A. Int.Rev.Code, § 811(a, c)]. In arriving at this determination, the alleged indebtedness of this decedent to his sons, Robert B. Black, Donald S. Black and John B. Black (as shown by the records kept by the foregoing persons) is not recognized as a bona fide obligation of the decedent, and the alleged transfer of the foregoing property in satisfaction of such indebtedness is not regarded as a sale based upon an adequate consideration in money or money's worth, but as a transfer by decedent, testamentary in character, whereby decedent retained and exercised control over all the foregoing property up to the time of his death, and the further fact that all such transfers were made in contemplation of death.

At the outset it may be said that the action of the Commissioner can hardly be criticised in view of the facts and circumstances. The issues raised were so close and so subtle that the Commissioner was well within his right, if not his duty, when he made the additional assessment and left it to the claimants to seek recovery by proving the deficiency assessment erroneous. It was the province of the Commissioner to determine that the transfers here in dispute were without consideration and place the burden on the plaintiffs to produce sufficient evidence to convince this court that the deficiency assessment should not stand. The question is not, was the Commissioner's action wrong? The question now is, after a hearing of all the evidence, was there valid consideration for the transfers by the decedent, were the transfers valid gifts inter vivos? Or in the converse, were the transfers made in contemplation of death, i.e., to take effect in possession and enjoyment upon the decedent's death?

It is conceded that the main issue is the validity of the original transfers of stock from the decedent's name to the names of his four sons. The Commissioner's determination that there was no consideration for the later transfers rests on his assumption that the first transfers were not valid

Judgment for plaintiff.

William McE. Weldon, of Mansfield, Ohio, and Luther Day and Thomas M. Harman, of Jones, Day, Cockley & Reavis, all of Cleveland, Ohio, for plaintiff.

Don C. Miller, U. S. Atty., of Cleveland, Ohio, for defendant.

WILKIN, District Judge.

This case was submitted on the pleadings, the evidence, stipulations, and briefs. Jurisdiction of the court, authority of the plaintiffs, the assessment, collection, and payment of the tax, recovery of which is hereby sought, are admitted. It is also admitted that the claim for refund was filed in time, rejected, and that the commencement of this suit was within time. There is no dispute regarding the essential facts and therefore it is not necessary to repeat them here.

In March, 1939, the plaintiffs reported and paid an estate tax of $166,374.43. The Commissioner determined a deficiency in the sum of $519,549.25, which with interest the plaintiffs now seek to recover. The Commissioner's additional assessment was based on the following determination: The foregoing property is included in the gross estate under the provisions of Section 302(c) of the Revenue Act of 1926, as Amended by Joint Resolution of March 3,

gifts. If they were valid gifts, then there was valid consideration for the subsequent transfers made shortly before the decedent's death, because such subsequent transfers were repayments of advancements or loans from the estate of the sons.

The first gifts of stock were made by the decedent in 1917. He transferred substantial blocks of stock to his two older sons and transferred similar blocks of stock to himself as trustee for each of his two younger sons. When the younger sons became of age, transfers were made to them directly of the stock which he had held as trustee. The defendant says these transfers were not valid gifts for three reasons. 1. Because the decedent never intended the transfers to be gifts in praesenti of the shares transferred. 2. Because the decedent never made any delivery of the shares so transferred. 3. Because the decedent never relinquished any dominion or control over the shares transferred, or over the income from them, or over the proceeds from their sale until his death.

■ The case turns on the consideration of the third reason. The first and second reasons present no difficulty. The evidence convinces the court that the decedent intended to transfer the shares to the legal possession of his sons and, under the law, what he did constitutes a valid transfer. The transfers were duly recorded on the books of the Ohio Brass Company and new certificates were issued in the names of the sons. Books of account were then opened for the estate of each son and the stock so transferred was listed therein and the income from the stock was entered in such books. Safety deposit boxes were rented and the stock certificates were deposited therein. Under the law such acts have been construed to constitute valid transfers and delivery. Marshall v. Commissioner, 6 Cir., 57 F.2d 633; Bardach v. Commissioner, 6 Cir., 90 F.2d 323; Bingham v. White, D. C. Mass., 31 F.2d 574.

■ As to the defendant's third reason, it cannot be brushed aside so readily. When the stock was transferred to the names of the sons, powers of attorney were executed by the sons to the father. The books that were opened for the sons' estates were kept by the father or were under his supervision. He had access to the safety deposit boxes. He managed the property and kept the accounts.

The decedent had been a very successful businessman and a good father. The sons were young and inexperienced. Much of the time they were away at school. The eldest son served in the army in World War I and died in 1923 as a result of disease contracted in service. It was quite natural for the father to look after the property of the sons while they were away. The sons testified that when they became of age and returned from school the father insisted that they become acquainted with the books recording the history and transactions of the estates in their respective names. The evidence discloses that dividends in cash and stock were paid on the holdings of the sons and that in every instance such dividends were passed to the credit of the sons respectively. At times stock of the sons was sold and the proceeds were credited to their respective accounts. Bonds were purchased and paid for by checks drawn against the accounts of the sons. Such bonds were then recorded in the journals and ledgers of the estates.

What the father did was quite natural in the circumstances. It was not unlawful: it was commendable. There was nothing in the circumstances to indicate that it was done in contemplation of death.

In 1922 the decedent drew funds from the accounts of his four sons to pay his indebtedness to the Union Trust Company of Cleveland. These transactions were registered on the individual accounting records of each son so that as of December 30, 1922, the ledger account of each son showed a balance due from F. B. Black (decedent) of $100,000. At the time of these advances to the decedent the son John was an invalid and lived at Saranac Lake, New York. The son Robert was 24 years of age and attending college in New York. Donald was 18, and Roger 17 years of age. None of the sons was consulted by decedent with reference to these loans at the time they were made, but, with the possible exception of

John, all became aware of them later. Beginning in 1930 decedent borrowed again from the property listed in the names of the sons. These loans were not evidenced by notes but were all recorded in the individual accounting records of decedent and each of his three sons. In the meantime trust estates had been established for the grandsons of the decedent, and the decedent borrowed from such estates also.

The decedent was engaged at that time (1930–1934) in the development of his Raemelton Farms with an extensive building program. His withdrawals from funds listed in the names of his sons reached large amounts. At the end of that period the books showed an indebtedness of the decedent to each son of about five hundred thousand dollars. After the decedent paid off his indebtedness to the banks and to the Ohio Brass Company, he then proceeded to liquidate the indebtedness to his sons. This was done partially by the transfer of real estate and partially by cash and securities.

Here again it can be said that there was nothing unnatural about the transactions in view of all the circumstances. It is of course considered unlawful and improper for an agent or trustee to borrow or use the funds intrusted to his care; but in this case the relation was also that of father and sons. In some of the later transactions the securities or checks passed to the father bore the signatures of the sons. It would have been unnatural and reprehensible if the sons had not been willing to make loans to the father at a time when he was in need of cash. In all instances exact bookkeeping records of the transactions were maintained.

When the son John died in 1923, no Letters Testamentary were issued and there was no regular legal administration of his estate. He left an estate of $496,708.39. The bulk of this estate was distributed to the father and to the three brothers, with gifts of twenty shares of preferred stock of the Ohio Brass Company to each of five friends of the deceased son. The conduct of the decedent with reference to this son's estate is more difficult to understand. It is not as natural and plausible as the other conduct mentioned. Yet in view of all the circumstances it can hardly be said that the conduct was arbitrary appropriation or usurpation. Considering the source of the property standing in the name of the deceased son and the father's need at the time, the distribution made of it cannot be severely criticised. Certainly it could not be attacked except by one having an interest in the estate. That was not done. It must be presumed now that the distribution was agreed to by all the heirs and next of kin.

The evidence reveals that the decedent sought the advice of his auditors and accountants as to the means of establishing separate estates for his sons and the methods of keeping proper records. The sons testified that as soon as possible the father drew them into the management of their own property and insisted that they become familiar with the records of their estates. If at any time any son or all the sons had wished to take over the complete management and control of their property they could have done so. If the father had declined to surrender the property to them, they could have maintained successfully a suit to recover each his own specific property.

If the soldier son had left debts, his creditors could have had satisfaction of their claims out of the estate standing in his name; the father could not have defeated them. In view of that fact this court is constrained to hold that the original gifts were valid, in good faith, and that they constituted proper consideration for payments made by the decedent to refund amounts borrowed from the sons.

Considering all the evidence and the circumstances of the parties, the court is convinced that the decedent made valid gifts inter vivos to his sons and that he relinquished personal dominion and control over the property. Such management and care as he gave to the property of the sons thereafter was given as their agent under the powers of attorney, and the advancements from the estates of the sons to decedent were loans, and the records of such transactions were honestly and validly kept.

78

Coming now to the consideration of the gifts to the decedent's secretary and daughters-in-law, made a short time before his death: if this question were the only one presented to the court and the evidence revealed that these were the only gifts ever made by the decedent, the court would rule that the presumption that they had been given in contemplation of death had not been removed and would order that the gifts to these four women be included in the decedent's estate and subject to tax. But when the court considers these gifts in the light of the evidence regarding all other gifts, the court is compelled to recognize that it was a well-established practice of the decedent to make such gifts. The court having held that the much earlier gifts were not made in contemplation of death, is impelled to the same view regarding these later gifts because there were no intervening circumstances to indicate a premonition of death. True, the decedent at that time was a man of advanced years, but he was still enjoying good health and participating actively in the affairs of life. He died on horseback. The court is further influenced by the fact that these gifts were made just before Christmas and it had been the decedent's custom to remember these women at Christmas time in previous years. True these gifts were more substantial than earlier gifts, but if they had been prompted by contemplation of death, they no doubt would have been a great deal larger. Such gifts as these would not have much effect on the tax of an estate so large.

Coming to the remaining question of the valuation of the 6,015 shares of Class A stock, the court was much impressed, if not absolutely convinced, by the opinion of Mr. Percy Brown regarding this valuation. He said the value per share was $28.875. Mr. Witt, however, expressed the opinion that the value was not in excess of $26.875. Making some allowance for Mr. Witt's opinion, the court finds that the value was $28 a share.

The sole remaining question has to do with allowance for additional expense of administration, and that has been provided for by stipulation and need not be considered by the court unless the parties fail to agree in accordance with the stipulation.