**DIERKS v. UNITED STATES et al.**

No. 4886.

United States District Court D. Kansas, First Division.

Aug. 19, 1949.

P. W. Croker, Kansas City, Kansas, and by Vernon Kassebaum and Paul Barnett of the firm of Watson, Ess, Barnett, Whittaker & Marshal, Kansas City, for plaintiff.

Andrew D. Sharpe and James P. Garland, Special Assistants to the Attorney General, and Randolph Carpenter, United States Attorney and Eugene W. Davis, Assistant United States Attorney, Federal Building, Topeka, Kansas, (Theron Lamar Caudle, Assistant Attorney General, on the brief), for the Government.

MELLOTT, District Judge.

This is a suit for refund of estate taxes. Two of the issues raised by the pleadings have been settled, the remaining one being whether gifts by the decedent of bonds and stock to her three children were made in contemplation of death. Many of the basic facts have been admitted in the pleadings or in a stipulation of facts entered into following a pre-trial conference. They, by this reference, are specifically found by the court. Some of the admitted facts are included in the findings, in abbreviated form. Others will be referred to in the opinion.

### Findings of Fact.

1. The decedent, born August 12, 1862, died testate January 22, 1940 at the age of seventy-seven (77) years, five (5) months and ten (10) days. At the time of her death she was a resident of Johnson County, Kansas and survived by three children, whose names and ages were:

Frederick H. Dierks, son, (hereinafter Fred) 50 years.

Mae G. Sutherland, daughter, (hereinafter Mae) 51 years.

Rachel G. Wallace, daughter, (hereinafter Rachel) 45 years.

They were the legatees and devisees under decedent's will and her sole heirs.

2. The last will and testament of the deceased was duly proved in the Probate Court of Johnson County, Fred qualifying as executor and now so acting, the estate not having been closed. Estate tax return was duly filed and the amount shown to be due was paid. Following assessment of additional tax, duly made, the executor paid the proper collector more than the amount presently in issue and in due time filed claims for refund, the sufficiency and timeliness of which are not questioned.

3. The total gross estate shown by the return was $179,322.08. In determining the additional tax the commissioner added (inter alia) the property shown in schedule G to have been transferred by the decedent to her children on October 15, 1937 "without an adequate and full consideration in money or money's worth, but not believed to be includible in gross estate," viz.:

| To Frederick H. Dierks | | |
|---|---|---|
| $14,000 Bonds, Dierks Co. | $14280.00 | |
| 720 shares, Dierks Co. | 37832.83 | |
| | | $52,112.83 |
| To Mae G. Sutherland | | |
| $14,000 Bonds, Dierks Co. | $14280.00 | |
| 721 shares, Dierks Co. | 37852.50 | |
| | | $52,132.50 |
| To Rachel D. Wallace | | |
| $14,000 Bonds, Dierks Co. | $14280.00 | |
| 721 shares, Dierks Co. | 37852.50 | |
| | | $52,132.50 |
| Total | | $156,377.83 |

The value stated was used by the commissioner in assessing the additional tax and is not in dispute.

4. On February 8, 1916, decedent was the wife of Herman Dierks, (hereinafter Herman). On that date they entered into a separation agreement, pursuant to which Herman conveyed to her 200 shares of the capital stock of Choctaw Lumber Co.;

approximately 12,000 acres of land in Oklahoma, subject to a timber deed to the Choctaw Lumber Co.; a residence property and another piece of real estate in Jackson County, Missouri; $25,000 in cash. He also executed promissory notes, payable to decedent, aggregating $325,000.00, payable as follows: $20,000 on February 8, 1920, and every year thereafter until 1924; $30,000 on February 8, 1924, and every year thereafter until 1928; $35,000 on February 8, 1928, and every year thereafter until the entire amount should be paid, all notes bearing interest from date at the rate of five per cent per annum. The agreement provided that Herman should have the right to make payment of any sum on any note before maturity at any interest-paying date, and that such sum, when so paid, should ·be deducted from the principal. (Stip. 12, 13 Ex. G attached thereto, Tr. 80–82).[1]

5. Pursuant to other terms of the separation agreement, Herman also executed and delivered his promissory notes to each of his four children then living, namely, Fred, Mae, Rachel and Chauncy A., in the sum of $200,000 each, or in the aggregate, $800,000.

6. The agreement provided that decedent was to accept the property transferred to her in full satisfaction and relinquishment of all claims and demands of every kind and character, present or future, either for dower interest, alimony or maintenance, which she then had, or at any time in the future might have, against Herman and that she waived any claim whatsoever to any property, or interest in property, real or personal, whatsoever situate, which then belonged to, or might thereafter be acquired by, Herman. Also, that in the event a divorce decree should thereafter be granted to either party, if either should re-marry, the children should not be disinherited in any will, it being a part of the consideration that the children should share, in the estates of their parents, in equal portion with all of their heirs at law. Following the execution of

1. References to exhibits and pages of the transcript are illustrative only and are not intended to be complete.

the agreement, Herman and decedent were divorced, the court approving the separation agreement and declaring it to be fair and equitable.

7. On February 22, 1925, Chauncy A. Dierks, the son of Herman and decedent, died. Decedent, as one of his heirs, received certain shares of the capital stock of the Dierks Lumber and Coal Co., which he had received from his father. Such stock, plus the moneys, securities, and property received by her from Herman under the separation agreement and the increment thereon, comprised substantially the entire estate of the decedent both at the time of the gifts in question and at the time of her death. (Tr. 34–39, 68, Stip. 22).

8. ·On May 26, 1925 decedent executed a will which contained essentially the same provisions as the will under which her estate is being probated, except that the bequests and devises to her three children were of the residue of her estate subject to four specific bequests of $10 to each of her four brothers.

9. For many years prior to her death decedent resided on a small country estate in Johnson County. She made a practice of getting up at about 5:30 in the morning, doing most of her cooking and housework and supervising the care of her five acre tract of land. She liked country life and gave away much of the produce of her little farm. She had had very little schooling, was a woman of simple tastes, without social ambition, and not extravagant in her expenditures. Her visitors were largely members of her family and a few old friends of long acquaintance. She had several grandchildren and enjoyed having them with her. She was of a cheerful, happy, carefree disposition, not given to worrying about her physical condition or to talking about death or her health. (Tr. 49–52, 54, 57–59, 88–89, 92–95, 108, Dep. Dr. Stoffer 11–12).

10. Decedent's financial affairs were handled almost entirely by her son Fred and her nephew, Arthur A. Waters. The latter lived with her. Her household expenses were paid principally by checks made out by Fred or Arthur. Her money was kept in a joint bank account with her son Fred. She did not study her bankbook or concern herself about how much money she had. She had little interest in business affairs and apparently felt that she had more assets and income than were necessary for her support. She had little knowledge of, or interest in, taxes. Her income tax reports were made out from books kept by her nephew, Arthur, and they were signed by her without question, or by her son, Fred, as her agent. At no time, when discussing the gifts in question, did she inquire about inheritance taxes, estate taxes, or the costs of administration of her estate. (Tr. 28–32, 40–45, 52–54, 58, 59–62, 89–91).

11. In June of 1934, Dierks Lumber & Coal Co., the Choctaw Lumber Co., and Pine Valley Lumber Co., each filed in the District Court of the United States for the Western District of Missouri, a petition for reorganization under the provisions of section 77b of the Bankruptcy Act. The proceedings were consolidated and a plan of reorganization was ultimately confirmed under which the three corporations were merged or consolidated into a single corporation, namely, Dierks Lumber & Coal Co., incorporated under the laws of Delaware. (Stip. 19, 20, 21, Ex. J, K, L, M, N attached thereto).

12. As a result of the pendency of, and the necessity for, the reorganization proceedings, the three corporations ceased to pay dividends and the salary of Herman, as president of the Dierks Lumber & Coal Co., had been substantially reduced. Prior to the reorganization Herman had paid the principal and interest upon the notes which he had executed to decedent; but when the reorganization proceedings were instituted, he ceased to make payments on both principal and interest. No payments were made during the years 1931 to 1935. (Tr. 39–41. Following the reorganization, the Dierks Lumber & Coal Co., prospered. In the year 1937 Herman paid interest on the unpaid notes executed to decedent aggregating $17,770.20, and the company resumed payment of dividends. In 1936 the net income of decedent had been $4,200.38. In 1937 it was $40,608.03; in 1938, $9,562.-

836

26; and in 1939, $13,590.02. (Tr. 39–40, Ex. 3–C, 4–D, 5–E, 6–F).

13. On the night of March 9, 1937, decedent suffered a coronary occlusion, as a result of which she fell or had a fainting spell. A physician was summoned the following morning, who had her removed to St. Luke's Hospital, primarily for observation. She remained in the hospital three days, during which the diagnosis of coronary occlusion was confirmed by electrocardiograph. (Dep. Dr. Stoffer p. 3–4). She was up and around after March 18th, about eight days after entering the hospital. She was treated for coronary occlusion during the months of March, April and May, the doctor calling on her at her home on March 13, 16, 18, 20, 22, 27, and 29; April 1, 2, 7, 8, 10, 13, 17, 24, 27, and 30; May 4, 12, and 16. By July the coronary condition had pretty well cleared up. (Dep. Dr. Stoffer p. 17 and 18).

14. Decedent was not informed as to her condition or the cause of her illness. The diagnosis was, however, disclosed to her children and the doctor, as was his custom in such cases, gave them a rather grave prognosis. (Dep. Dr. Stoffer). Decedent did not express any concern or apprehension over her condition nor did she inquire of the doctor regarding her life expectancy. (Dep. Dr. Stoffer 5, 22). The physician's visits to her home were made at the request of her son and son-in-law, she never requesting him to make such calls. (Dep. Dr. Stoffer 5).

15. In 1937 the life expectancy of a person suffering a coronary occlusion was considered by the medical profession to be about two years. As the result of experience gained in the past few years, the life expectancy is now estimated at between five and ten years. (Dep. Dr. Stoffer 13, 21). Decedent did not suffer a recurrence of the coronary occlusion. The cause of her death—cirrhosis of the liver—was not associated, indirectly or otherwise, with the coronary occlusion. (Dep. Dr. Stoffer 6, 7, 10, 12).

16. Some time in the month of March, 1937 decedent executed a will which contained substantially the same provisions as the will executed October 14, 1937, under which her estate was probated, except that the bequests and devises to her three children were of the residue of her estate, subject to a specific bequest to her nephew, Arthur A. Waters, of $10,000 to be paid either in cash or in common stock of Dierks Lumber & Coal Company on the basis of $100 per share, with a provision that if Waters did not survive the testator the legacy should lapse. (Stip. 18, Ex. I attached thereto).

17. In July of 1937, the physician who had treated decedent previously, made several calls on her, treating her for a cold. During the months of August and September of 1937, three "check up visits" were made. (Dep. Dr. Stoffer p. 19). During the month of October 1937, the same doctor treated her for an attack of pyelitis—infection of the pelvis of the kidney. In that connection he called at her home on October 7, 8, 9, 10, 13, 16, 19, 23, and 26. During that period she was in bed part of the time but was mentally active and cheerful. (Dep. Dr. Stoffer 19–2).

18. On October 14, 1937, decedent executed her last will and testament, by the provisions of which she gave, devised and bequeathed to her three children, share and share alike, all of her estate, with the proviso that if any of them should not survive her but should leave issue, then the share which the deceased child would have taken should vest in his surviving issue, and if none, in decedent's children. (Stip. 2, Ex. A attached thereto). This will was similar in all respects to the will made by the deceased in March of 1937, except that it omitted the bequest of $10,000 to Arthur A. Waters. It was made for the specific purpose of revoking that bequest, the deceased having ascertained that Waters had received a similar gift inter vivos from her former husband, Herman, (Tr. 48, 76–77). The gifts in issue were made the next day.

19. None of the donees was in financial need at the time the gifts were made. Each possessed substantial property. The net incomes shown by their returns were:

| Donee | 1936 | 1937 |
|---|---|---|
| Fred | 14693.13 | 36507.45 |
| Mae | 47288.08 | 38638.35 |
| Rachel | 52463.54 | 70711.66 |

None of the parties, prior to the gifts, had made any inquiries as to the amount of the gift tax, the effect of the gifts on the estate tax or the increase in income tax which would result. Fred, who handled the details of the gifts for his mother, had not consulted a lawyer and did not know the amount of income tax either of his sisters was paying. The transfers were not made for the purpose of avoiding tax. (Tr. 61–62, 93–96, 106).

20. On various occasions, beginning about ten years before her death, (excepting a period during the depression when the three Dierks' companies were undergoing reorganization) decedent made statements indicating that she desired to make gifts to her children of some of her property. She occasionally expressed the view that her son, Fred, was not properly aiding her in making the gifts which she desired to make. The children were reluctant to accept gifts from her and felt that they should do so, if at all, only when all three were present. Rachel, the youngest daughter, made her home in Florida. The gifts in question were made during a visit by her. No mention was made by decedent of a gift to her children at the time she suffered the coronary occlusion in March of 1937. (Tr. 49, 56, 73, 74, 82–86, 105–109, 113).

21. In October of 1937, the same month in which the gifts were made, decedent was persuaded by her son Fred to accompany him, his wife and sister on one of their regular visits to the Mayo Clinic in Rochester, Minnesota. She entered the clinic October 29, 1937, and was discharged November 6, 1937. (Dep. Dr. Stoffer 25, Dep. Dr. Eusterman 3, Tr. 87).

The decedent, at that time, was sufficiently aware of her condition to relate to the examining physicians symptoms which were entirely compatible with, and indicative of, the ultimate findings of the clinic. The physician attending her in the preliminary examination reported the symptoms related by her as follows: "Wants general check of heart and kidneys. Shortness of breath, swelling of stomach, pain over heart, especially pronounced over past year —gradually getting worse. Question of high blood pressure but not known how long this has been going on. Patient is 74 or 75 years old and doesn't get along as well as formerly; can't get along as well as formerly because of shortness of breath. Gets attacks when she is full of gas—backs up on her. No definite swelling of legs or ankles, but stomach swells. No checkup since some sort of rectal operation at Battle Creek ten years ago." (Dep. Dr. Eusterman 6, 7, Dep. Dr. Willius Ex. A attached thereto).

22. The examinations at the Mayo Clinic disclosed that decedent was suffering from the following: Coronary heart disease with mild decomposition and articular fibrillation (a condition generally associated with angina pectoris); enlarged liver, found to be "more or less cirrhotic", resulting from latent gallbladder disease with history of approximately 25 years; marked kyphosis of the upper dorsal spine (commonly known as curvature of the spine); congestion of both bases of the lungs (a condition generally associated with weakness of the heart muscles); and two minor ailments—low grade jaundice and trichomanas vaginitis. Surgical intervention would have been recommended for chronic cholecystites but was not because of the patient's enlarged liver, heart condition, advanced age, and general state of health. (Dep. Dr. Eusterman 2–5, Dep. Dr. Willius 8, 11, 12, Ex. C, D attached to Dep. Dr. Stoffer).

23. While at the Mayo Clinic decedent did not appear to be concerned or apprehensive about her condition. (Dep. Dr. Eusterman 6). The diagnosis was not communicated to her, but was forwarded to her physician, Dr. Stoffer, who, in turn, advised her son, Fred of the results of the examinations. (Dep. Dr. Stoffer 43, 45). Her medical history thereafter and until her death may be summarized as follows: July 7, 1938, the condition of pyelitis returned but responded to treatment and cleared up, no symptom of coronary occlu-

sion (Dep. Dr. Stoffer 6 and 7); December 12, 1938, acute intestinal upset, but otherwise in good condition, albumin found in urine (Dep. Dr. Stoffer 7–8); June 12, 1939, sugar found in blood, diet restricted, but insulin not prescribed because the case was not of sufficient gravity (Dep. Dr. Stoffer 9); August 12, 1939, examination disclosed a very definite enlargement of the liver diagnosed as cirrhosis of the liver; removed to St. Luke's Hospital on September 7, 1939, where she remained under treatment for cirrhosis of the liver until her death on January 22, 1940. (Dep. Dr. Stoffer 9–10).

24. The gifts by the decedent to her children on October 15, 1937 were not made as a substitution for a testamentary disposition of the property, were not prompted by the thought of death or any motive associated with death and were not made in contemplation of death.

## Conclusions of Law.

1. This court has jurisdiction of the parties and of the subject of the action.

2. The gifts in issue were correctly reported in the estate tax return filed by decedent's executor.

3. The Treasury Department erred in including in gross estate the value of the property transferred by decedent to her children on October 15, 1937 and in assessing additional tax based thereon.

4. Claims for refund having been duly made and this suit having been timely filed, plaintiff is entitled to judgment for the amount of the over-payment in tax attributable to the inclusion in gross estate of the property referred to in the preceding conclusion, together with interest as provided by law.

5. The stipulation of counsel, compromising and settling other issues raised by the pleadings, is approved by the court.

6. One-half of the costs in this court shall be assessed against plaintiff. Counsel for plaintiff shall prepare appropriate form of judgment. Settle as provided in the Federal Rules of Civil Procedure, 28 U.S. C.A., and the Rules of Practice of this court.

## Opinion.

█ The findings made and the conclusions reached are dispositive of the issue before the court. The phrase, "contemplation of death", as used in the applicable statute,[2] has been construed in a legion of decided cases. It has been administratively interpreted by the Treasury Department, obviously in the light of the language used by Mr. Chief Justice Hughes in the Wells[3] case. Thus in the regulation[4] it is pointed out that the phrase "does not mean, on the one hand, that general expectation of death such as all persons entertain, nor, on the other, is its meaning restricted to an apprehension that death is imminent or near." The proscribed transfers are those "prompted by the thought of death", examples of which are transfers "made with the purpose of avoiding the tax, or as a substitution for a testamentary disposition of the property, or for any other motive associated with death."

██ At the trial, and again upon brief, counsel seem to espouse some conflicting views, not only upon the fact issue, but also upon the part presumptions and "burden of proof" play. The gifts were made more than two years before the donor's death; so the statutory presumption does not exist. The presumption arising from the administrative determination additional tax was due existed at the beginning of the trial and plaintiff had the burden of going forward with the evidence.[5] He did so. He therefore had the burden of proving, by a fair preponderance of the evidence, all facts necessary to show that

2. Sec. 811(c) I.R.C., 26 U.S.C.A. § 811(c).

3. United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867.

4. Treasury Regulations 105, Sec. 81.16.

5. Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184; Oliver v. Bell, 3 Cir., 103 F.2d 760, 763; Smails v. O'Malley, 8 Cir., 127 F.2d 410, 412; Wishard v. United States, 7 Cir., 143 F. 2d 704, 706.

the exaction of additional tax from the estate which he represents, was illegal. In other words, to show that the gifts had not been made in contemplation of death. In this court's studied judgment the required showing has been made.

It is always difficult, and seldom desirable, for the trier of a fact issue to attempt to rationalize the conclusion reached. The Treasury regulation suggests that, in determining whether a gift was made in contemplation of death, consideration should be given to "the bodily and mental condition of the decedent and all other facts and circumstances * * * [should be] scrutinized to determine whether or not * * * [the] thought [of death] prompted the disposition." Such consideration and scrutiny have been given.

■ The evidence chiefly relied upon by counsel for the government is the age and physical condition of the decedent at the time the gifts were made. She was then past seventy-five years of age, suffering from several more or less serious organic diseases (Finding 22) and undoubtedly had some knowledge of her condition (Finding 21), notwithstanding the failure of the attending physician to give her a complete diagnosis or prognosis. But the evidence indicates that her age and physical condition had little to do with the gifts. As early as 1916, at the time the settlement was negotiated with her husband, and continuing throughout the years she had expressed the desire to have her children accept a substantial part of her property; but they "wouldn't allow it" (Tr. 82, 83). When the subject was broached by her at different times, the two children living in the same part of the country where she lived urged that she do nothing in the absence of the third. When the third was present on visits the subject was not brought up. The children were not in want and were reluctant to accept any part of their mother's property. Finally, in the fall of 1937, while all of the children were present, gifts aggregating less than one-half of her property were made. The property remaining was more than ample for her support. The gifts were permitted by the children for the purpose of "satisfying" their mother by acceding to her wishes, she, at all times being of the opinion that the property received from her husband had really been "the children's money."

What has been said points up the apparent dominant motive for the gift, which, in this court's studied judgment, was not one "associated with death." Counsel for the defendant argue that "no life motive has been established or even asserted", to which answer is made that it is not necessary a life motive be shown but only that proof be made contemplation of death was not the motive. The point need not be labored. As Mr. Justice Hughes pointed out in the Wells case, supra [283 U.S. 102, 51 S.Ct. 452], "The gratification of such desires [as the desire to recognize special needs or exigencies or to discharge moral obligations] may be a more compelling motive than any thought of death." The inquiry, in short, should be whether "contemplation of death be the inducing cause of the transfer." The court is of the opinion that it was not in the case at bar.[6]

■ Findings have been made that the transfers were not made for the purpose of avoiding tax (Finding 19) or as a substitution for a testamentary disposition of the property. (Finding 24). There is ample evidence to support the former, some of which is contained in the finding itself. As to the latter, the circumstance that the third draft of decedent's will within a twelve-year period had occurred just shortly before the gifts were made is neutral and without significance. Each of the wills had provided for division of the property equally among the children. The last draft merely eliminated a small bequest to decedent's nephew. "This is not a case where a settlor, having made one plan for the disposition of his property, later makes a different one to avoid death taxes.[6] Nor is it a case where a testator is merely trying to make effective, before his death, the bequests made in his will to the end that death duties be avoided. As this court

6. Allen v. Trust Co., 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367.

840

views the evidence, decedent was merely carrying out an intention, formed years previously, to give her children property which she did not need for her support, to be enjoyed by them before her death.

█ The court agrees with the expressed view of counsel for defendant that it is relevant to consider decedent's age and physical condition at the time the gifts were made and that the Government is not required to produce direct evidence decedent was aware of her state of health. It is apparent the investigating officers of the Treasury Department had ample evidence to justify their determination; and, as earlier pointed out, the plaintiff had the burden of proving facts necessary to show that it was erroneous. It is believed that he has done so. While there was some evidence the decedent was not aware of the precise state of her health at the time the gifts were made, the court cannot find as a fact that she did not know she was ill. The evidence clearly indicates, however, that the state of her health had nothing to do with the making of the gifts. Being of the opinion that the gifts were not in contemplation of death the court has concluded that refund of the tax in issue should be made.