C. B. KNISKERN, Jr., Kenneth F. Kniskern, and Janet E. Shrader, Co-Executors, Estate of Frank L. Felix, Deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 63-587

United States District Court
S. D. Florida,
Miami Division.

July 15, 1964.

Cyrus A. Neuman (Felix, Kniskern, Neuman & Rees) Miami, Fla., for plaintiffs.

Lavinia L. Redd, Ass't U. S. Atty., Wm. A. Meadows, U. S. Atty., Miami, Fla., J. Patrick Whaley, Dept. of Justice, Washington, D. C., for defendant.

FULTON, Judge.

In this action tried before this Court without a jury, the Plaintiffs seek to recover Federal estate taxes and interest paid on behalf of the Estate of Frank L. Felix, plus interest as provided by law.

## FINDINGS OF FACT

1. The decedent, Frank L. Felix, was born on September 29, 1858 and died on April 27, 1959. Until he went to the hospital ten days before his demise, he was amazingly strong for a man 100 years old, both physically and mentally. Few men many years his junior could match his zest for living. Motion pictures in color taken at his 100th birthday celebration and slides taken prior and subsequent thereto were displayed to the Court and revealed the decedent's extraordinary vitality, geniality and enjoyment of life.

2. The decedent survived his wife by more than 25 years. He had two children, a son, Douglas, and a daughter,

8

Mary. Mary was married to Charles B. Kniskern, Sr., hereinafter referred to as Charles, Sr. The Kniskerns had three children, Charles B. Kniskern, Jr., hereinafter referred to as Charles, Jr., Kenneth F. Kniskern, hereinafter referred to as Kenneth, and Janet Shrader, hereinafter referred to as Janet. During the last 30 years of his life, decedent lived in the same house with Mary and Charles, Sr. The grandchildren grew up in the same house with decedent. At all times, decedent had an exceptionally close relationship with his grandchildren. He was extremely fond of his 9 great-grandchildren. In 1957, the decedent's son, Douglas, died. The decedent withstood the shock of this event with remarkable fortitude and thereafter became even more closely attached to his grandchildren.

3. On March 12, 1958, at the age of 99, the decedent made gifts of common stock of Peabody Coal Company to his three grandchildren and to their spouses. Each grandchild and each spouse received 1600 shares. The total of 9600 shares had a value on the date of the gifts of $85,200.

4. The Internal Revenue Service determined that the aforementioned gifts were made in contemplation of death and were, therefore, includible in the decedent's gross estate. It included them at the value of $157,800 which was the value of the 9,600 shares on the estate tax valuation date, April 27, 1960. In 1958, the decedent also made cash gifts to his grandchildren and their spouses in the total amount of $1,917. The Internal Revenue Service determined that such gifts were also made in contemplation of death.

5. The timing of the gifts was prompted by the decedent's receipt on February 28, 1958, of 20,400 shares of Peabody Coal Company common stock, plus $126,000 in negotiable 5% notes of a Peabody subsidiary in the liquidation of the Duncan Coal Company, in partial exchange for the decedent's 15 shares of Duncan Coal Company stock.

6. The Duncan Coal Company was a closed family corporation, numbering about 35 stockholders. Its stock had no market and was not traded. In 1957, the decedent received $1,950 in dividends from the Duncan Coal Company. In each of the three prior years he received $1,200 in dividends.

7. The Peabody stock was traded on the New York Stock Exchange. It paid dividends of 40¢ per share. The 20,400 Peabody shares would produce $8,160 in annual dividend income; the $126,000 5% notes would produce $6,300 in annual interest income. The total of $14,460 from these two sources, therefore, exceeded the $1,950 Duncan dividends in 1957 by $12,510.

8. The decedent's total net income for 1957 was $15,799. His future income was, therefore, due to be in excess of $28,000. This sum was substantially in excess of his needs and living expenses, which were modest.

9. The Peabody transaction and the decedent's future income were fully explained to him by his grandson, Charles, Jr. On January 14, 1958, the decedent signed his 1957 income tax return. He complained about the size of his income tax. He had violently complained about his income taxes many times in the past. His grandson, Charles, Jr., who brought the 1957 return to him for execution, told him that his 1958 income tax would be substantially greater, due to capital gain on the Duncan liquidation and due to his increased dividend and interest income.

10. Thereafter, prior to March 12, 1958, decedent told his daughter, Mary, that the Peabody transaction was bringing him in more money and income than he had any need or use for, and that he would like to make gifts to his grandchildren in order to help them and in order to see them enjoy the gifts during his lifetime.

11. His daughter suggested that he use the Peabody stock to make his gifts, so as to reduce his dividend income and thereby reduce his income taxes. The decedent was pleased with that idea.

Thereafter, the decedent repeated to his son-in-law, Charles, Sr., the same explanation of his motives for the gifts, and stated, in addition, that he wanted to reduce his income taxes. A statement by decedent of the motives set forth above was overheard by the Kniskerns' maid, Mary Crockett, at the Kniskerns' breakfast table. The decedent subsequently made the same explanation of his motives to his grandson, Charles, Jr. Charles, Jr., at the request of the decedent, advised him as to the number of Peabody shares he could afford to give away. Charles, Jr. suggested that the gifts be divided between the grandchildren and their spouses. His purpose was to minimize gift taxes. Charles, Jr. arranged for registration of the stock certificates and prepared envelopes which the decedent presented to the donees at a family gathering in April, 1958 on the occasion of Charles, Sr.'s birthday.

12. Charles, Jr., the decedent's grandson, first learned about the proposed Peabody stock gifts from his mother. Although he thereafter helped to implement the gifts, as above set forth, and although he was a tax lawyer by profession, neither he nor any member of his law firm, nor anyone of whom he had knowledge, directly or indirectly suggested, induced or caused the Peabody stock gifts, except for the aforesaid suggestion from the decedent's daughter, Mary.

13. At no time prior to the gifts or subsequent thereto did Charles, Jr. or anyone else discuss the subject of estate taxes with the decedent. He was never heard to mention the subject of estate taxes.

14. When the decedent presented the stock certificates to his grandchildren, his explanation of his motives to Kenneth and Janet was the same as set forth in paragraph 10, supra. During the evening, he also stated to his granddaughter, Janet, that the gift would help her in the construction of her house.

15. At the time of the gifts, Janet and her husband were commencing construction of a new house. She had talked

to the decedent about the plans on numerous occasions. He was aware that the Shraders were contemplating reducing the size of the proposed house because of its expense. He stated that he did not want them to have to do this. The Peabody stock was used by the Shraders in part to finance the construction. When the building started in April, the decedent frequently visited the site of construction and watched its progress.

16. Decedent's grandson, Kenneth, resigned his executive job at Burdine's Department Store in September, 1957, and entered law school at the University of Miami. He had very little income. The decedent knew about his situation. The income from the Peabody stock and the proceeds of its sale subsequently realized by his grandson, Kenneth, helped to maintain him while he went through law school.

17. His grandson, Charles, Jr., and his family had outgrown their small house in March, 1958. This grandson intended to build a new, larger house whenever he could. He had talked about his plans in front of his grandfather. The Peabody stock was used by him to finance, in part, a new house which he subsequently built, although not in the year 1958.

18. The decedent was a generous man. He had a history of seven different substantial prior gifts between 1938 and 1952, totaling in excess of $115,000. In addition, he made repeated smaller cash gifts, on many occasions, for which gift tax returns were not filed. At Christmas, 1957, he gave each grandchild $500. These checks were not actually received until January 10, 1958. He made additional cash gifts to his grandchildren in 1958 in the total amount of $417.

19. The 9600 Peabody shares given away by the decedent constituted only about 10% of his total property. The property retained by the decedent was more than adequate for his needs.

20. In early 1959, his grandson, Charles, Jr., suggested to decedent that he sell the balance of the Peabody shares

and purchase real estate in Nassau. He explained to decedent that the family had an exceptionally large amount of Peabody stock which had enjoyed an exceptional rise in value, in that in less than a year it had almost doubled in value, and that Nassau real estate was an excellent investment. The decedent agreed. Part of the purpose, on the part of the grandson, in suggesting an investment in foreign real estate was to reduce estate taxes; however, he said nothing about this to decedent.

21. In 1953, the decedent executed a will, the provisions of which were recommended by his son, Douglas, an attorney, and drafted by his grandson, Charles, Jr. In October, 1956, decedent's son, Douglas, was operated on for a malignant brain tumor. Thereafter, he was never able to speak again, and died in July, 1957. As a result of Douglas Felix's condition, Charles, Jr. prepared a codicil to the decedent's 1953 will which eliminated Douglas as a joint beneficiary of the decedent's residence with the decedent's daughter, Mary. This was the residence in which she resided. There was ill feeling between his daughter and Douglas's wife. Moreover, the decedent disliked his daughter-in-law. In view of Douglas's condition, the bequest to him, if he should survive the decedent, was in practical effect a bequest in part, to Douglas's wife. Accordingly, the codicil was prepared, explained to the decedent, and the decedent signed it in November, 1956. The codicil was recommended by his grandson, Charles, Jr., who was then managing decedent's affairs.

22. In April, 1957, Charles, Jr. prepared a new will for decedent. The new will made three changes in the 1953 will.

(a) Douglas was eliminated as a one-half beneficiary of the testamentary trust. The reason for this was that Douglas was dying.

(b) The three grandchildren were made beneficiaries of the trust income currently to the extent not needed by their mother, the primary beneficiary. The reason for this was that their mother already had ample income of her own and if she needed it could receive substantial additional income under Douglas's will. Under the 1953 will, therefore, the income would have been needlessly accumulated. The 1957 change permitted current distribution of income.

(c) An apportionment clause was added, requiring recipients, other than his daughter, of property passing outside the probate estate but includible in the taxable estate, to pay their prorata share of the estate tax. Charles, Jr.'s purpose in adding this clause was to insure that Douglas' estate would be required to contribute in an equitable manner to the estate tax liability of decedent's estate in the event any prior gifts by the decedent to Douglas might be held to be in contemplation of death. Douglas' wife was a primary beneficiary of Douglas' estate, and Charles, Jr. knew his grandfather would want to minimize any benefits to be received by Mrs. Douglas Felix directly or indirectly from him. Charles, Jr., at the time, was not certain exactly what gifts had previously been made by the decedent to Douglas or when they had been made. The apportionment clause was intended by Charles, Jr. as a precautionary measure.

23. The April, 1957 will was entirely the idea and conception of Charles, Jr. It was never discussed with the decedent until it was in final form, at which time Charles, Jr. took it to his grandfather for execution. He explained the change in the provisions of the trust. He did not explain the apportionment clause, stating that it was merely a technical change.

24. In July, 1958, Charles, Jr. prepared a codicil in which the apportionment clause was eliminated. As a result of the Peabody stock gifts in March, Charles, Jr. and his brother and sister were now potentially liable for a share of the estate tax in the event the gifts should be held to be in contemplation of death. Under such circumstances, under the existing clause, they would have to raise the cash to pay a portion of the estate taxes even though on their mother's death they, or

their descendants, would be equal beneficiaries of the entire estate of decedent. For this reason, he eliminated the apportionment clause. Had he known in April, 1957, that he and his brother and sister were going to receive large gifts from the decedent, he would never have inserted the apportionment clause in its form as included in the April, 1957 will.

Charles, Jr. mailed the July, 1958 codicil to his grandfather in Hendersonville, North Carolina, with the explanation that it was a technical change. The codicil was entirely the idea of Charles, Jr.

25. For the entire year 1957, the decedent's total medical expense was $51. His doctor, Dr. Norman McKenzie, approved him for eye cataract surgery in 1956, and stated that his heart, blood pressure and general condition were good in both 1956 and 1957. In 1958, decedent's doctor was Dr. Phillips. He saw him only four times in the entire year, all office visits. The decedent spent six months in Hendersonville, North Carolina in 1958, from May through October. During this entire period, his total medical expense was $5, to Dr. McDonald of Hendersonville. In 1958, decedent also paid $15 to Dr. Litterer, a skin specialist.

26. Beginning in March or April of 1958, a full-time attendant was employed for the decedent over the decedent's vigorous protests that this was unnecessary. This was occasioned by the fact that decedent had a fall in a cramped area between his bed and walkway leading to his bathroom. The area was so cramped and the decedent's frame was large and he was wedged in and unable to get up. His daughter, Mary, felt that, as a result of this incident, it would be advisable to get someone to be with him. A male practical nurse was employed for this purpose and he was with the decedent until November of 1958. At that time, he was replaced by a young attendant who had been a waiter at the Country Club in Hendersonville, North Carolina. This attendant remained until decedent's death.

27. Decedent traveled to Hendersonville, North Carolina every year, starting in 1952, and spent six months there in each year. Generally, he traveled by plane, but on occasion he went by auto. In 1958, after his 100th birthday, he insisted on driving back to Miami with his attendant, because he "wanted to see the country."

28. During the last two years of decedent's life:

(a) He took walks twice daily.

(b) He kept charge of the sprinkler system in the yard, consisting of four separate sections which had to be alternated.

(c) He frequently repaired the sprinkler system on his hands and knees, after obtaining the tools himself.

(d) He worked on the supports for some fruit trees with a sledgehammer.

(e) He, from time to time, went with his son-in-law to a stock broker's office.

(f) He went for frequent automobile rides with the Kniskerns' maid.

(g) He visited his son, Douglas, daily while in Coral Gables, during the latter's invalid period prior to his death.

(h) He went to the Coral Reef Yacht Club in Miami on Thanksgiving, 1958.

(i) He went walking in Bayfront Park in Miami in February, 1959.

(j) He played with his great-grandchildren frequently, bouncing them on his knees.

(k) He went to Church and Bible Class almost every Sunday while in Miami, including the last Sunday before he went to the hospital in April, 1959. After Bible Class, he smoked his pipe and visited with friends until Church services started, and then attended Church.

29. During the last two years of decedent's life:

(a) He had an alert, clear mind.

(b) He had an excellent memory.

(c) He was greatly interested in radio and television. Each morning he cut out the program section from the newspaper and followed the schedules through the day and evening. He changed channels and stations by himself. He was particularly interested in newscasts and sometimes left the dinner table so as not to miss a favorite news program.

(d) He was interested in current events, financial matters, investments, real estate, and the daily stock market quotations on his favorite stocks.

(e) He was resentful of and rejected all attempts at special attention or assistance, and even insisted on emptying the waste basket in his room daily. He continuously objected to the attendant whom his daughter hired to watch over him.

(f) He was cheerful. He never complained about his health. He never talked about death.

(g) He was extremely fond of his great-grandchildren and always enjoyed spending time with them when they came for visits.

(h) He was extremely proud of his age and his physical condition and boasted of having the physique of a man 25 to 30 years his junior.

(i) He planned and looked ahead to the future. He was determined that "he was going to make that centennial mark and even longer.[1]"

(j) Shortly after his 100th birthday in Hendersonville, he expressed a desire to see the Indian play, "Unto These Hills." When told that it was no longer playing that season, he stated that he would see it when he came back to North Carolina the following year.

(k) In December, 1958, when his granddaughter, Janet, was pregnant, he stated that he would enjoy seeing the baby when Janet and her husband visited in North Carolina the following summer.

(l) He repeatedly stated that he would sell his stock in Standard Oil of New Jersey when it reached a certain price. Each time the price was reached, he raised his goal again. During the last two years of his life, he stated that he would sell when the stock reached a price of 90. At the time, the stock was trading at around 45.

(m) The Minister of decedent's Church, who had known decedent for many years and who often called upon him at his home, made a capsule summary of the decedent's attitude and outlook at the age of 99 in the following words: "HE WAS FULL OF THE JOY OF LIVING."

30. It was established by the expert testimony of a physician who specialized in geriatrics that persons of extremely advanced age do not normally have any expectation of imminent death. They plan for the future and expect to live indefinitely. The decedent, Frank L. Felix, likewise had no expectation of imminent death and was still planning for the future at the time he made the gifts to his grandchildren in 1958.

31. The gifts by decedent to his grandchildren in 1958 were made for motives associated with life and were not in contemplation of death.

CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action.

2. The gifts of stock and cash made by the decedent to his grandchildren in 1958 were not made in contemplation of death and are not includible in his gross estate.

A holding that the gifts in question were in contemplation of death would have to be based on the proposition that because the decedent had attained the age of 99 at the time of the gifts and had a very short life expectancy under the mortality tables, he necessarily was motivated by an expectation of imminent death. This is not the law. The question to be determined is whether as a matter

---

1. The quoted words are those of Dr. Kenneth Phillips, the Government's own witness.

of actual fact the thought of death was the impelling cause of the transfers. United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867. The Court holds that Frank L. Felix neither expected imminent death nor was motivated by thoughts of death when he made the gifts to his grandchildren.

The gifts in question were made for motives which have repeatedly been held to be motives associated with life. The primary motive was to see his grandchildren enjoy the benefits of the stock during the decedent's lifetime. Rowe, Exec. v. Fahs, (S.D.Fla.1954) 48 A.F.T.R. 1576; Dierks, Exec. v. United States, 86 F.Supp. 832 (D.Kans., 1949); Safford, Exec. v. United States (1928), 66 Ct.Cl. 242, 6 A.F.T.R. 8016.

An additional motive was to reduce the income taxes resulting from the decedent's acquisition of newly acquired dividend paying stock. A desire to decrease income taxes is a motive associated with life. Becker v. St. Louis Union Trust, 296 U.S. 48, 56 S.Ct. 78, 80 L.Ed. 35; Central National Bank of Cleveland v. United States, 94 Ct.Cl. 527, 41 F.Supp. 239 (1941).

One of the reasons for the gifts was to meet financial needs of the donee grandchildren. This, too, is a motive associated with life. Willard Foster, Exec., 25 BTA 414; Est. of John Moir, 47 BTA 765.

The timing of the gifts was prompted by the decedent's receipt of negotiable securities, which produced income substantially in excess of his needs. Gifts prompted by such circumstances are not in contemplation of death, Estate of Kroger v. Commissioner, 43, 392 T. C. Memo Opinion, aff'd. without discussion of this point, 145 F.2d 901 (6th Cir. 1944), Mertens Law of Federal Gift and Estate Taxation, Sec. 22.25, particularly where the sum given represented only a small part of Frank Felix's estate. Est. of Julius Selling, 24 T.C. 191; Black, Exec. v. United States, 68 F.Supp. 74 (N.D.Ohio, 1946) where the assets retained, which constituted virtually Frank Felix's entire estate, had a value and in-

come greatly in excess of his needs, see Estate of Oliver Johnson, 10 T.C. 680; and where the evidence shows a history of substantial prior gifts, indicating long-standing generosity, United States v. Wells, supra; Percy B. Eckhart, Exec., 33 BTA 426.

Judgment shall be entered for the plaintiffs in an amount to be stipulated by the parties.